

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2005

# Bronshtein v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 01-9004

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Bronshtein v. Horn" (2005). *2005 Decisions.* Paper 1280.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1280

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 01-9004 & 01-9005
_____

ANTUAN BRONSHTEIN

v.

MARTIN L. HORN, Commissioner, Pennsylvania
Department of Corrections


MARTIN HORN, COMMISSIONER,
PENNSYLVANIA DEPARTMENT OF
CORRECTIONS; *JAMES PRICE,
SUPERINTENDENT OF THE STATE
CORRECTIONAL INSTITUTION AT GREENE;
JOSEPH P.
MAZURKIEWICZ, SUPERINTENDENT OF THE
STATE CORRECTIONAL
INSTITUTION AT ROCKVIEW; **GERALD J.
PAPPERT, ATTORNEY
GENERAL OF PENNSYLVANIA,

Appellants, No. 01-9004

*(Pursuant to Rule 12(a), F.R.A.P.)

**(Amended in accordance with Clerk's Order dated 6/23/04)
_____

ANTUAN BRONSHTEIN,

Appellant, No. 01-9005

v.

MARTIN HORN, Commissioner, Pennsylvania Department of Corrections; *JAMES PRICE, SUPERINTENDENT OF THE STATE CORRECTIONAL INSTITUTION AT GREENE; JOSEPH P. MAZURKIEWICZ, SUPERINTENDENT OF THE STATE CORRECTIONAL INSTITUTION AT ROCKVIEW; **GERALD J. PAPPERT, ATTORNEY GENERAL OF PENNSYLVANIA

*(Amended in accordance with Clerk's Order dated 8/29/01.)
**(Amended in accordance with Clerk's Order dated 6/23/04.)

_____

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE EASTERN
DISTRICT OF PENNSYLVANIA

(D.C. No. 99-cv-02186)
District Judge: The Honorable Lowell A. Reed, Jr.

_____

Argued: April 22, 2003

Before: ALITO, BARRY, and STAPLETON, <u>Circuit Judges</u>

(Opinion Filed: April 14, 2005)

Patrick J. O'Connor, Esq.
Peter G. Rossi, Esq.
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103

Louis M. Natali, Jr. Esq. (Argued)
Turner & McDonald, P.C.
1725 Spruce Street
Philadelphia, PA 19103

Counsel for Appellee/Cross-Appellant

2

Patricia E. Coonahan (Argued)
Assistant District Attorney Captain,
 Appellate Division
Mary MacNeil Killinger
Deputy District Attorney
Chief, Appellate Division
Office of District Attorney
P.O. Box 311
Norristown, PA   19104

Counsel for Appellants/Cross-Appellees

_____

OPINION OF THE COURT
_____

ALITO, Circuit Judge:

Antuan Bronshtein was convicted in a Pennsylvania court for first-degree murder and sentenced to death. After unsuccessful post-trial litigation in the state courts, he filed the habeas petition now at issue. The District Court found merit in some but not all of Bronshtein's claims and ordered that a writ of habeas corpus be granted unless Bronshtein was retried within a specified time. The habeas respondent (hereinafter "the Commonwealth") appealed, and Bronshtein cross-appealed. We reverse the order of the District Court insofar as it required a new guilt-phase trial, but we affirm insofar as it required resentencing.

I.

In April 1994, Antuan Bronshtein was tried in the Court of Common Pleas of Montgomery County on charges stemming from the robbery and shooting death of Alexander Gutman. The evidence at trial may be summarized follows. At about 5 p.m. on January 11, 1991, Montgomery County police investigated a robbery at a store called Jewelry by Alex in the Valley Forge Shopping Center. See Commonwealth v. Bronshtein, 691 A.2d 907, 911 (Pa. 1997), cert. denied, 522 U.S. 936 (1997). The police

discovered that the proprietor, Alexander Gutman, had been killed by two gunshot wounds to the face. Id. Investigators found three fingerprints and a palmprint on one of the intact display cases in the store, and these prints were later identified as Bronshtein's. Id.

On February 27, 1991, Bronshtein contacted Philadelphia police investigators and said that he wanted to discuss the murder of another jeweler, Jerome Slobotkin, who had been killed in Philadelphia on February 19, 1991. Bronshtein, 691 A.2d at 912. After waiving his Miranda rights, Bronshtein signed a detailed written confession admitting to the Slobotkin murder, and in February 1992, he was convicted for that offense. Id.

About a month after Bronshtein confessed to the Slobotkin murder, Montgomery County police met with Bronshtein, at his request, to discuss the Gutman murder. During this interview, Bronshtein denied killing Slobotkin and said that both Slobotkin and Gutman had been killed by a "Mr. X," whom Bronshtein described as a high-level member of the "Russian mafia." Id. During this interview, Bronshtein did not disclose Mr. X's name, but he later identified him as Adik Karlitsky, another jeweler. Id.

Although Bronshtein told the Montgomery County police that he had not killed Gutman, Bronshtein admitted that he was acquainted with him and that he knew that he owned a jewelry store. Bronshtein, 691 A.2d at 912. However, Bronshtein denied knowing the location of the store or even that of the Valley Forge Shopping Center, and he claimed that he had not seen Gutman in more than two years. Id.

At trial, however, three witnesses identified Bronshtein as a man whom they had seen in or near Gutman's store on the day of his murder. Laura Sechrist stated that she had passed the store at approximately noon and had seen Bronshtein and another man talking to Gutman. Bronshtein, 691 A.2d at 912. Larry Bainbridge, a postal carrier, testified that he had walked by the store at 12:45 p.m. and had seen Bronshtein behind the counter. Id. Alexander Daniels testified that he had passed the store at about 3:15 p.m. and had seen Bronshtein standing outside the store. Id.

4

Finally, a man named Wilson Perez testified about an admission made by Bronshtein during January 1991. According to Perez, he and Bronshtein were riding in Bronshtein's car on Roosevelt Boulevard in Philadelphia when Bronshtein said that he had killed a man in a jewelry store "out past the boulevard" and had taken his jewelry. Bronshtein, 691 A.2d at 912. As the Pennsylvania Supreme Court noted, Roosevelt Boulevard "runs in a northerly and southerly direction through Northeast Philadelphia," and "[i]n order to travel to Montgomery County from a large section of Northeast Philadelphia, it is necessary to cross . . . Roosevelt Boulevard." Id. at 912 n.12. Perez further testified that Bronshtein had given unset gemstones to Perez's brother. Id. at 912.

The Commonwealth proceeded on the theory that, although a second person had probably been involved in the robbery of Gutman's store, it was Bronshtein who intentionally shot and killed Gutman. Bronshtein, on the other hand, contended that Adik Karlitsky shot and killed Gutman. According to Bronshtein, Karlitsky was a high-level member of a Russian organized crime group. Bronshtein said that he worked for Karlitsky as a jewelry "fence" and had merely accompanied Karlitsky to Gutman's store without knowing that Karlitsky was going to kill him.

The jury convicted Bronshtein of first-degree murder, robbery, theft of movable property, and possession of an instrument of crime, as well as conspiracy to commit murder, robbery, and theft. At the penalty phase, the jury found two aggravating circumstances: that Bronshtein had "committed [the] killing while in the perpetration of a felony," 42 Pa. Cons. Stat. § 9711(d)(6), and that he had "a significant history of felony convictions involving the use or threat of violence to the person." 42 Pa. Cons. Stat. § 9711(d)(9). The jury found three mitigating circumstances: extreme mental or emotional disturbance, poor childhood upbringing, and "a possibility that the defendant did not pull the trigger." App. VI at 1969; see 42 Pa. Cons. Stat. § 9711(e)(2), (8). However, the jury found that the aggravating circumstances outweighed the mitigating circumstances and accordingly returned a sentence of death for the first-degree murder conviction. The trial court subsequently imposed the death sentence along with

5

consecutive terms of imprisonment for the other convictions. The Pennsylvania Supreme Court affirmed, Commonwealth v. Bronshtein, 691 A.2d 907 (Pa. 1997), and the United States Supreme Court denied certiorari on October 20, 1997. 522 U.S. 936 (1997).

On December 3, 1997, the Center for Legal Education, Advocacy and Defense Assistance ("CLEADA") filed a "pro se" Post-Conviction Relief Act ("PCRA") petition on Bronshtein's behalf ("pro se PCRA petition"). The petition did not state any claim for relief; it merely stated: "This is not a counseled PCRA petition, but a request to initiate review, filed pro se. A counseled petition shall be filed later pursuant to the court's order." App. VII at 2126. The petition was signed by a CLEADA attorney, purportedly with Bronshtein's authorization.

Shortly after the "pro se" PCRA petition was filed, Bronshtein personally informed the trial court "that he wished to waive his right to appeal and to terminate the PCRA proceedings so that the sentence of death could be carried out immediately." Id. at 2121. He later told the court that the CLEADA attorneys "had been misleading him and acting contrary to his instructions[.]" Id. at 2121 n.2. On January 26, 1999, after extensive litigation over Bronshtein's competency to waive his rights under the PCRA, the trial court issued an order dismissing the "pro se" PCRA petition with prejudice. The court found that Bronshtein had "knowingly, intelligently and voluntarily" sought to withdraw the petition. Id. at 2125.

Bronshtein's mother and sister filed a next friend appeal from the trial court's order. On April 16, 1999, the appeal was denied by the Pennsylvania Supreme Court, which held that the appellants had failed to show that Bronshtein was incompetent. Commonwealth v. Bronshtein, 729 A.2d 1102 (Pa. 1999). On April 23, 1999, Bronshtein's mother and sister filed a petition for a writ of habeas corpus in the District Court and asked the Court to issue a stay of execution. On April 29, 1999, during a hearing on the petition, Bronshtein informed the District Court that he had changed his mind and wished to pursue post-conviction relief. The District Court stayed Bronshtein's execution, appointed counsel for

6

him, and gave him 120 days to prepare and file his own federal habeas petition.

On June 9, 1999, Bronshtein filed with the state trial court a petition styled as an "Amended Petition For Habeas Corpus Relief Under Article I, Section 14 Of The Pennsylvania Constitution And For Statutory Post Conviction Relief Under The Post Conviction Relief Act." The trial court treated the petition as a second PCRA petition and dismissed it for lack of jurisdiction, holding both that Bronshtein had "irrevocably waived" his right to seek post-conviction relief and that the petition was untimely. App. VII at 2111-13. The Pennsylvania Supreme Court affirmed, stating that it "agree[d] with the PCRA court that [Bronshtein's] petition [was] untimely, leaving [it] without jurisdiction to reach [Bronshtein's] issues." Commonwealth v. Bronshtein, 752 A.2d 868, 871 (Pa. 2000). The Pennsylvania Supreme Court found that Bronshtein's "judgment became final on October 20, 1997, the date that the United States Supreme Court denied certiorari." Id. at 870. The state supreme court therefore reasoned that Bronshtein "was required to file his petition for post-conviction relief within one year of October 20, 1997, that is by October 20, 1998, in order for his PCRA petition to be timely filed." Id. The Pennsylvania Supreme Court did not address the question whether Bronshtein had "irrevocably waived" his right to seek post-conviction relief, as the trial court had held.

Bronshtein filed the present petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on October 27, 1999. The petition asserted 15 claims, but only seven are at issue in this appeal. The following claims (numbered as they were in the petition) are before us:

> I. The trial court violated due process by erroneously instructing the jury that Bronshtein's specific intent could be inferred from the actions of his co-conspirator.

> III. Bronshtein's death sentence violates the Eighth Amendment because it was based in part on an aggravating circumstance (42 Pa.

7

Cons. Stat. Ann. § 9711(d)(6)) that the jury did not find beyond a reasonable doubt.

IV. The trial court violated Bronshtein's federal constitutional rights by excluding material and relevant defense evidence.

V. The trial court's admission of "other crimes" evidence violated Bronshtein's federal constitutional rights.

VI. Bronshtein's due process rights were violated by repeated acts of prosecutorial misconduct.

VII. The prosecution violated Batson v. Kentucky, 476 U.S. 79 (1986), by exercising a peremptory strike against a potential juror of Russian-Jewish heritage.

IX. The trial court violated the Eighth Amendment by failing to inform the jury that a life sentence in Pennsylvania means life without the possibility of parole.

The District Court handed down a decision without holding an evidentiary hearing. See Bronshtein v. Horn, 2001 WL 767593, 2001 U.S. Dist. LEXIS 9310 (E.D. Pa. July 5, 2001). Before reaching the merits of Bronshtein's claims, the District Court first addressed the issue of procedural default. Although some of Bronshtein's claims had been raised in the state courts for the first time in the second PCRA petition, which the state supreme court had found to be untimely, the District Court held that these claims were not procedurally defaulted, "because the procedural rule that the Supreme Court of Pennsylvania relied upon in rejecting his claims was not clearly established or regularly followed at the time of his alleged default, [and] therefore was not sufficiently 'adequate' to bar federal habeas review." App. I at 3, 7-21. Turning to the merits, the District Court concluded that the trial court's instructions on co-conspirator liability had violated Bronshtein's due process rights by permitting the jury to convict

8

Bronshtein of first-degree murder without finding that he had the specific intent to kill, and the District Court found that this error was not harmless. See id. at 25-34. The District Court next concluded that the trial court had violated Simmons v. South Carolina, 512 U.S. 154 (1994), by failing to inform the jury that a Pennsylvania prisoner sentenced to life imprisonment may not be paroled. See id. at 35-41. Finally, the Court concluded that Bronshtein's death sentence violated the Eighth Amendment because it was based in part on an invalid aggravating circumstance (42 Pa. Cons. Stat. § 9711(d)(6) (commission of the killing while in the perpetration of a felony)).

The Court ordered that a writ of habeas corpus be issued if the Commonwealth did not retry Bronshtein within 180 days, and in light of this relief, the Court found it unnecessary to address the other claims raised in the petition. See App. I at 46 n.33. The Court stated that Bronshtein had not argued "that his convictions for robbery, theft, and conspiracy were constitutionally flawed," and the Court therefore did "not consider those convictions[.]" Id. at 47 n.35.

Bronshtein filed a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e). He argued that his § 2254 petition did in fact raise claims – specifically, Claims IV, V, VI and VII – challenging his robbery, theft, and conspiracy convictions. The District Court denied the motion and held that the "voluminous and carefully crafted submissions on [Claims IV, V and VI] can only be read to challenge the murder conviction." Bronshtein v. Horn, 2001 WL 936702 (E.D. Pa. Aug. 16, 2001). However, the Court agreed with Bronshtein that Claim VII addressed the other convictions, but the Court rejected that claim on the merits. Id.

The Commonwealth has appealed the District Court's order granting relief on Claims I, III, and IX. Bronshtein has filed a cross-appeal, and he requests a certificate of appealability on Claims IV, V, VI and VII. His request was referred to this panel and is now before us along with the Commonwealth's appeal.

9

## II.

We first consider the claims (i.e., Claims I, III, and IX) on which the District Court granted relief. All of these claims were raised for the first time in the state courts in the second PCRA petition and, as noted, the Pennsylvania Supreme Court affirmed the dismissal of that petition on the ground that it was untimely. The Commonwealth therefore contends that federal habeas review of the merits of these claims is blocked by the doctrine of procedural default.

The procedural default doctrine precludes a federal habeas court from "review[ing] a question of federal law decided by a state court if the decision of that court rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991) (emphasis added). The United States Supreme Court has employed a variety of tests to determine whether a state ground is "adequate." Among other things, state procedural rules have been held to be inadequate if they are not "firmly established and regularly followed," Ford v. Georgia, 498 U.S. 411, 424 (1991) (quoting James v. Kentucky, 466 U.S. 341, 348-51 (1984)); see also Barr v. City of Columbia, 378 U.S. 146, 149 (1964), or if they are "novel[]" and unforeseeable. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 457 (1958); see also Ford, 498 U.S. at 424.

First, the test ensures that federal review is not barred unless a habeas petitioner had fair notice of the need to follow the state procedural rule. As we said in Cabrera v. Barbo, 175 F.3d 307, 313 (3d Cir. 1999), "a petitioner should be on notice of how to present his claims in the state courts if his failure to present them is to bar him from advancing them in a federal court."

Second, the "'firmly established and regularly followed' test" prevents discrimination. "Novelty in procedural requirements," NAACP v. Alabama ex rel. Patterson, 357 U.S. at 457, can be used as a means of defeating claims that are disfavored on the merits. If inconsistently applied procedural rules sufficed as "adequate" grounds of decision, they could provide a convenient

10

pretext for state courts to scuttle federal claims without federal review. The requirement of regular application ensures that review is foreclosed by what may honestly be called "rules" – directions of general applicability – rather than by whim or prejudice against a claim or claimant.

In this case, as noted, the District Court held that the state procedural rule on which the Pennsylvania Supreme Court based its decision was not "firmly established and regularly followed" at the relevant time. The Court's analysis proceeded in three steps.

First, the Court identified the relevant rule as "the rule that § 9545(b)(1) operates as an absolute, jurisdictional bar to hearing the merits of a late PCRA petition, and that no exceptions outside those in the statute may save a petition filed more than one year after the date judgment becomes final." App. I at 13. Second, the Court concluded that the relevant point in time was "the moment petitioner violated the procedural rule; that is, at the time Bronshtein's one-year window under § 9545(b)(1) closed." Id. Since direct review of Bronshtein's conviction and sentence ended when the United States Supreme Court denied his petition for a writ of certiorari on October 20, 1997, the District Court concluded that the critical date was October 20, 1998. Finally, the Court found that the state procedural rule applied by the Pennsylvania Supreme Court was not "firmly established and regularly followed" on that date.

We agree with the District Court that the rule applied by the Pennsylvania Supreme Court was not firmly established and regularly applied until after Bronshtein missed the PCRA's one-year filing deadline. To be sure, the pertinent statutory provision, 42 Pa. Cons. Stat. Ann. § 9545(b), which took effect on January 16, 1996, appears on its face to impose a one-year deadline in all cases except those falling within three categories (none of which is applicable here).[1]  Nevertheless, as the District Court observed,

---

[1]This provision states in relevant part:

(1) Any petition under this subchapter, including a

11

strict enforcement of the provision did not begin immediately.

Well before the enactment of this provision, the Pennsylvania Supreme Court had begun to apply a "relaxed waiver rule" in capital cases. See Commonwealth v. McKenna, 383 A.2d 174 (Pa. 1978). In McKenna, the Court stated that it bore a "duty to transcend procedural rules" in capital cases because of the "overwhelming public interest" in preventing unconstitutional executions. Id. at 180-81. As we have observed, McKenna for a time "firmly established that a claim of constitutional error in a

> second or subsequent petition, shall be filed within one year of the date the judgment becomes final, unless the petition alleges and the petitioner proves that:
>
>> (i) the failure to raise the claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States;
>> (ii) the facts upon which the claim is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence; or
>> (iii) the right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.

42 Pa. Cons. Stat. Ann. § 9545(b)(1).

12

capital case would not be waived by a failure to preserve it." Szuchon v. Lehman, 273 F.3d 299, 326 (3d Cir. 2001).

Twenty years later, on November 23, 1998, the state supreme court changed course in Commonwealth v. Albrecht, 720 A.2d 693 (Pa. 1998). After noting that it had long been the Court's "'practice' to decline to apply ordinary waiver principles in capital cases," the Court stated that this rule had "in effect, virtually eliminated any semblance of finality in capital cases." Id. at 700. The Court concluded that the "benefits of relaxed waiver at the PCRA appellate stage" were greatly outweighed by the need for finality and judicial efficiency, and the Court announced that the relaxed waiver rule would "no longer [apply] in PCRA appeals." Id.

On December 21, 1998, the state supreme court held in Commonwealth v. Peterkin, 722 A.2d 638 (Pa. 1998), that the PCRA time bar applies to capital cases and is not superceded by the relaxed waiver rule. Finally, on March 2, 1999, the state supreme court held unequivocally in Commonwealth v. Banks, 726 A.2d 374 (Pa. 1999), that the PCRA time limits are jurisdictional and thus not subject to judicial relaxation. Although one might argue that either Albrecht or Peterkin marked the point when it became firmly established that the PCRA time limits would be applied literally in capital cases, our opinion in Fahy v. Horn, 240 F.3d 239, 245 (3d Cir. 2001), implies that the unavailability of judicially created exceptions to the PCRA time limits was less than perfectly clear until the state supreme court decided Banks. For present purposes, however, it is not necessary for us to decide whether Albrecht, Peterkin, or Banks marked the critical point in time because Bronshtein's one-year deadline expired before the earliest of the three dates. As of October 20, 1998 – the one-year anniversary of the conclusion of direct review in Bronshtein's case – Bronshtein did not have fair notice that he would not be given the benefit of the "relaxed waiver" rule and that his failure to file his PCRA petition within the one-year statutory deadline would result in the dismissal of his petition. Moreover, holding Bronshtein strictly to the one-year deadline would have denied him the more lenient treatment that the state courts had allowed other capital defendants up to that point. We thus agree with the District Court

13

that the state procedural rule at issue in this case – the rule strictly requiring a capital defendant to file a PCRA petition within one year after the end of direct review – was not firmly established and regularly followed at the time in question.

Our analysis of the question of procedural default would proceed along a different path if the Pennsylvania Supreme Court, when it abandoned the doctrine of "relaxed waiver," had adopted what might be termed a "transitional rule," i.e., a rule imposing a special filing deadline for those cases in which a PCRA petitioner's one-year filing period expired prior to the end of the "relaxed waiver" era.[2]  Accordingly, it would have made sense for the state supreme court to have adopted a rule requiring such petitioners to file within some specified time after the termination of the doctrine of "relaxed waiver."  However, no such transitional rule was invoked by the state supreme court in this case, and none has been called to our attention.  The only state law ground that we may consider in deciding the issue of procedural default in this case is the general one-year deadline.  Because this rule was not firmly established and regularly applied on the date when Bronshtein's time ran out, the doctrine of procedural default does not apply in this case.  We thus turn to the merits of the claims on which the District Court granted  relief.

III.

Bronshtein argues (Claim I) that the trial court's jury instructions violated his right to due process because they permitted the jury to convict him of first-degree murder on the theory of co-conspirator liability without finding an essential element of the offense, viz., that he had the specific intent to kill.  Under Pennsylvania law, a defendant may not be convicted of first-degree murder under a co-conspirator liability theory unless the jury finds

---

[2]The Pennsylvania Supreme Court has adopted such a rule in at least one analogous context.  See Commonwealth v. Lark, 746 A. 585 (Pa. 2000)(when ground for filing second PCRA petition arises while first petition is still pending, petitioner may file second petition within 60 days after final decision on first petition).

that the defendant personally had the specific intent to kill. See Smith v. Horn, 120 F.3d 400, 410 (3d Cir. 1997). "The general rule of law [in Pennsylvania] pertaining to the culpability of conspirators is that each individual member of the conspiracy is criminally responsible for the acts of his co-conspirators committed in furtherance of the conspiracy." Commonwealth v. Wayne, 720 A.2d 456, 463 (Pa. 1998). However, "[t]o be guilty of first degree murder, each co-conspirator must individually be found to possess the mental state necessary to establish first degree murder – *the specific intent to kill*." Id. at 464 (emphasis in original).[3] This principle was settled at the time of Bronshtein's trial. See Commonwealth v. Huffman, 638 A.2d 961, 962 (Pa. 1994).

In considering whether the jury instructions in this case adequately conveyed this critical feature of Pennsylvania homicide law,[4] we focus initially on the language that is claimed to be erroneous, but we must view this portion of the instructions "in the context of the charge as a whole." See Smith, 120 F.3d at 411. "The proper inquiry is whether there is a *reasonable likelihood* that the jury has applied the challenged instructions in a way that violates the Constitution." Id. (emphasis in original, citations and internal quotation marks omitted); see Boyde v. California, 494 U.S. 370, 380 (1990).

In the present case, Bronshtein was charged, *inter alia*, with first degree murder and conspiracy to commit murder. As we hereafter explain, while the trial court's instructions regarding the first degree murder charge were such that the jury could have convicted him of this charge without finding that he had a specific intent to kill Gutman, the court's instructions regarding conspiracy to commit murder and the jury's verdict of guilty on that charge

---

[3]Compare Tison v. Arizona, 481 U.S. 137, 158 (1986) ("major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the [Eighth Amendment] culpability requirement").

[4]We do not apply the deferential standards of review set out in 28 U.S.C. § 2254(d) because this claim was not "adjudicated on the merits" by the state supreme court.

15

demonstrate beyond a reasonable doubt that the jury made the required finding of specific intent. Accordingly, we conclude that any error in the first degree murder instructions was harmless.

The trial judge instructed the jury that Bronshtein could be found guilty of first degree murder based on any of three separate theories. First, the trial judge charged the jury, Bronshtein could be found guilty as a principal if the jury found that "each and every element of [the crime] was established as to him specifically . . . ." App. V, Pt. 2 at 1692. The trial court then correctly instructed the jury that the three elements needed to convict Bronshtein for the first-degree murder of Alexander Gutman were (1) that Gutman was killed, (2) that the defendant killed him, and (3) that the defendant did so with the specific intent to kill. Id.

The trial judge also instructed the jury that Bronshtein could be found guilty as an accomplice of the person who actually killed Gutman but that, in order to do so, the jury would have to find that Bronshtein had the specific intent to kill. The judge stated:

A defendant is guilty of a crime if he is an accomplice of another person who commits the crime . . . .

He is an accomplice if and only if with the intent of promotion or facilitating commission of the crime he encourages the other person to commit it or aids, agrees to aid or attempts to aid the other person in planning or committing it . . . .

*[I]n order to find the defendant guilty of first-degree murder as an accomplice, you must find the Commonwealth has proven beyond a reasonable doubt that the defendant shared a specific intent to kill Alexander Gutman with the active perpetrator and encouraged or assisted the active perpetrator by comparable overt behavior.*

Remember when we talked about first-degree murder? That's the one that requires that specific

16

intent to kill? Yes, it is possible to convict the defendant as an accomplice to that even if he's not the one who killed Mr. Gutman, but *you'd have to find that he shared that specific intent to kill Alexander Gutman before you can find him guilty as an accomplice*, and that he assisted the active perpetrator by some comparable overt behavior.

App. V, Pt. 2 at 1689-91 (emphasis added).

Finally, the trial court instructed the jury that it could find Bronshtein guilty of the various crimes with which he was charged under the theory of co-conspirator liability. The court stated:

You may find the defendant [guilty] of either the crime of murder, robbery or theft as a conspirator if you're satisfied beyond a reasonable doubt: First, that the defendant agreed with this John Doe or Mr. X that the defendant would aid John Doe or Mr. X in committing either the crime of murder, robbery and/or theft; second, that the defendant so agreed with the intent of promoting or facilitating the commission of the crime; third, that while the agreement remained in effect, the crime of murder, robbery and/or theft was committed by this John Doe or Mr. X; and, fourth, that the crime of murder, robbery and/or theft, while it may differ from the agreed crime, was committed by John Doe or Mr. X in furtherance of his and the defendant's common scheme.

What am I saying to you? If those four elements have been established, then, if you find that the defendant is guilty of the conspiracy, he is also guilty of anything that John Doe or Mr. X did in furtherance of it . . . .
[I]f you find those things, then, he can be found guilty of whatever acts the co-conspirator did in the furtherance of that agreement reached between them.

17

Id. at 1687-89.

Unfortunately, this instruction misleadingly suggested that Bronshtein could be found guilty of first-degree murder even if he did not have the specific intent to kill. According to a literal reading of the instruction, the jury could find Bronshtein guilty of first-degree murder if it found that he had conspired to commit the robbery and that another conspirator had killed Gutman in furtherance of the robbery. Compounding the error, the instruction went on to say that if the jury found that the four elements set out above were established, Bronshtein was "guilty of anything that John Doe or Mr. X did in furtherance of [the conspiracy]."

While the instructions on liability as a principal or accomplice stressed the need to find a specific intent to kill, these instructions did not cure the defect in the instructions on co-conspirator liability. As the District Court put it: "A reasonable jury could have understood the co-conspirator language to be an alternate means to establish first degree murder, *sans* a finding of specific intent to kill."' Dist. Ct. Op. at 27.

For similar reasons, the flaw in the co-conspirator liability instructions was not adequately cured by the supplemental instructions on first-degree murder that were given, at the jury's request, during its deliberations.[5] At that time, the trial judge gave the jury the following "summary on first-degree murder": "what sets [first-degree murder] apart from second- and third-degree murder is that element of the specific intent to kill either personally, if you find that he did the act, or as a co-conspirator of one who had the specific intent to kill[.]" App. V, Pt. 2 at 1725. Although these supplemental instructions were accurate, they did not specifically address the theory of co-conspirator liability. "Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the

---

[5]These supplemental instructions on first-degree murder must be distinguished from the supplemental instruction on conspiracy, which we discuss below.

18

two irreconcilable instructions the jurors applied in reaching their verdict." Francis v. Franklin, 471 U.S. 307, 322 (1985). See also Whitney v. Horn, 280 F.3d 240, 256 (3d Cir. 2002). Viewing all of the first degree murder instructions together, we conclude that there is a reasonable probability that the jury, consistent with their terms, could have proceeded on the incorrect belief that a specific intent to kill was not needed in order to convict Bronshtein of first-degree murder on the theory of co-conspirator liability. We thus hold that the jury was improperly instructed on the theory of co-conspirator liability.

We further hold, however, that this error was harmless. As we explained in Smith, 120 F.3d at 416-17, an error of the type present here is subject to harmless error analysis. "In a collateral proceeding, the standard for harmlessness is 'whether the error had substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 417 (quoting California v. Roy, 519 U.S. 3, 5 (1996) (quoting Brecht v. Abrahamson, 507 U.S. 619 at 637 (1993)). In Smith, we elaborated:

> The Supreme Court has held that if a habeas court "is in grave doubt as to the harmlesssness of an error," habeas relief must be granted. O'Neal v. McAninch, 513 U.S. 432, 437 (1995). Thus, if the court concludes from the record that the error had a "substantial and injurious effect or influence" on the verdict, or if it is in "grave doubt" whether that is so, the error cannot be deemed harmless. See Roy, 519 U.S. at 5.

120 F.3d at 418 (parallel citations omitted).

Here, the jury's verdict finding Bronshtein guilty of conspiracy to commit murder convinces us that the error in the instructions on co-conspirator liability was harmless.[6] After stating

---

[6]The jury specifically found Bronshtein guilty of conspiracy to commit murder, as well as conspiracy to commit robbery and conspiracy to commit theft. Significantly, the jury's verdict did not

19

that Bronshtein was charged with conspiracy to commit murder, robbery and theft, the trial judge stated:

> [I]n order to find the defendant guilty of conspiracy to commit any one of those or all of them, you must be satisfied initially that the two elements of a conspiracy have been proven beyond a reasonable doubt. What are they? First, that the defendant agreed to aid another person. The Commonwealth merely defines that person or identifies that person as John Doe or Mr. X, meaning they don't know who it is.
>
> That the defendant agreed to aid another person, whoever it was, in the planning or commission of the crimes of murder, robbery or theft; and, second, that the defendant did so with the intent of promoting or facilitating commission of the crimes of murder, robbery and/or theft. Those are the two elements.

"lump" the object offenses together:

| Court Clerk: | How say you on 3279-93.5, second count, criminal conspiracy, conspiracy to commit murder? |
| --- | --- |
| Presiding Juror: | Guilty. |
| Court Clerk: | How say you on conspiracy to commit to robbery? |
| Presiding Juror: | Guilty. |
| Court Clerk: | How say you on conspiracy to commit theft? |
| Presiding Juror: | Guilty. |

App. V, Pt. 2 at 1747.

20

Id. at 1684-85. The most reasonable interpretation of these instructions is that, in order to find Bronshtein guilty of murder, the jury had to find that he had "the intent of promoting or facilitating commission of the crime[] of murder."[7]

This point was driven home with the supplemental instructions on conspiracy to commit murder that the court gave during the jury deliberations. As the Supreme Court has noted, this is the point in a trial when "[o]ne would expect most of [a jury's] reflection about the meaning of the instructions to occur[.]" Francis v. Franklin, 471 U.S. at 321 n.7. The trial judge in this case told the jury:

> [I]n order to find the defendant guilty of conspiracy to commit murder, you must be satisfied that two elements of the conspiracy have been proven beyond a reasonable doubt: First, that the defendant agreed to aid another person, namely, this John Doe or Mr. X, in either the planning or the commission of the

---

[7]Bronshtein contends that these instructions "lumped together the three offenses of murder, robbery and theft and created a reasonable likelihood that the jury would convict [him] of conspiracy to commit all three offenses merely because he conspired to commit one of them and Karlitsky [or whoever the second individual at the store was] then committed the others." Bronshtein's Br. at 58. In other words, Bronshtein argues that the jury might have understood the instructions to mean that they could find Bronshtein guilty of conspiracy to commit murder if they found merely that Bronshtein intentionally aided in planning or carrying out a theft. Such a reading of the instructions is contrary to common sense and, in our view, unlikely, but because the trial judge gave the supplemental instructions discussed above, we need not decide whether these instructions standing alone would be sufficient to establish harmless error. We note that, although the District Court held that the error in the co-conspirator liability instructions was not harmless, the District Court did not consider the impact of the supplemental instructions on conspiracy to commit murder that were given during the jury deliberations.

crime of murder. That's the first element. He agreed to aid another person in either the planning or the commission of the crime of murder – first element.

Second, that the defendant did so with the intent of promoting or facilitating the commission of the crime of murder.

Id. at 1733-34.

After receiving these instructions, the jury found Bronshtein guilty of conspiracy to commit murder. In returning that verdict, the jury presumably followed the court's instructions relating to that offense, see Weeks v. Angelone, 528 U.S. 225, 234 (2000), and therefore the jury must have found that Bronshtein participated in "the planning or the commission of the crime of murder" and that he "did so with the intent of promoting or facilitating the commission of the crime of murder." In other words, the jury must have found that Bronshtein had the specific intent to kill. It follows that the error in the instructions on the theory of co-conspirator liability cannot have affected the jury's verdict on the charge of first-degree murder. Even if the jury based that verdict on the theory of co-conspirator liability, and even if the jury proceeded on the erroneous belief that this theory did not require proof of a specific intent to kill, the jury's guilty verdict on the charge of conspiracy to commit murder shows that the jury found that Bronshtein had that intent.

The Pennsylvania Supreme Court's decision in Wayne, 720 A.2d 456 (Pa. 1998), is instructive. In Wayne, the Court concluded that the defendant was not prejudiced by his counsel's failure to object to jury instructions that, like the ones here, permitted the jury to convict him of first-degree murder as a co-conspirator without finding that he had the specific intent to kill. See Wayne, 720 A.2d at 465. The Court reached this conclusion because the defendant was also convicted of conspiracy to commit murder. See id. The Court explained:

A conspiracy to kill presupposes the deliberate

22

premeditated *shared* specific intent to commit murder. . . . In this case, the conspiracy was a conspiracy to kill. The conspiracy had only one object, the deliberate decision to take a life. Once this jury determined that appellant was guilty of conspiracy, given the sole object of that conspiracy, the only logical conclusion to reach is that this jury also determined, beyond a reasonable doubt, that appellant possessed the specific intent to kill.

Id. (emphasis in original). See also Commonwealth v. Bailey, 344 A.2d 869, 877 n.16 (Pa. 1975) ("A conspiracy to commit murder would necessarily indicate that the killing was 'willful, deliberate, and premeditated.'"); Commonwealth v. Stein, 585 A.2d 1048, 1050 n.6 (Pa. Super. Ct. 1991) ("[T]he 'intent' element required to be proven by the Commonwealth is the same for accomplice liability as for conspiracy.").[8] We agree with this analysis and hold that the error in the instructions on co-conspirator liability was harmless under the standard applicable in a federal habeas proceeding.

Bronshtein contends that our decision in Smith shows that Wayne "does not control here," Bronshtein's Br. at 57, but Smith is readily distinguishable. There, the conspiracy instructions were so ambiguous that they created the reasonable likelihood that the jury convicted the defendant of conspiracy to commit murder without finding that he had the intent to enter into the conspiracy to commit murder. See Smith, 120 F.3d at 412-13. Furthermore, the trial court's attempt to explain the ambiguous instructions actually made matters worse: it "conveyed the impression that

---

[8]By contrast, in Commonwealth v. Huffman, 638 A.2d 961, 963 (Pa. 1994), the Pennsylvania Supreme Court found that an error in the jury instructions similar to the one in Wayne (and the one here) was not harmless. However, in that case the defendant was convicted of conspiracy to commit burglary but not conspiracy to commit murder. See Wayne, 720 A.2d at 465 n.7. Obviously, conspiracy to commit burglary, unlike conspiracy to commit murder, does not require proof of an intent to kill.

23

Smith was criminally liable for conspiracy to commit murder if he intended to enter into a conspiracy to commit *robbery*[.]" Id. at 413 (emphasis in original). In short, in Smith, unlike Wayne or the present case, it was reasonably likely that the jury did not find that the defendant had the intent to enter into a conspiracy to commit murder, i.e, a specific intent to kill. Here, as we have explained, the supplemental instructions were very clear in telling the jury that it could not find Bronshtein guilty of conspiracy to commit murder unless it found that he had that intent. For these reasons, we must reverse the decision of the District Court insofar as it relates to Bronshtein's first-degree murder conviction.

IV.

We now address Bronshtein's argument (Claim IX ) that the trial court violated his right to due process by failing to instruct the jury that under Pennsylvania law a defendant who is convicted of first-degree murder must receive either a sentence of death or a sentence of life imprisonment without the possibility of parole. The District Court held that this claim has merit. On appeal, the Commonwealth contests the District Court's holding on two grounds.

A.

The Commonwealth's first argument, as we understand it, is that Simmons v. South Carolina, 512 U.S. 154 (1994), the seminal Supreme Court case on which Bronshtein's claim is predicated -- is inapplicable because Simmons does not apply retroactively to cases in which direct review ended prior to that decision. See O'Dell v. Netherland, 521 U.S. 151 (1997). However, the District Court properly rejected this argument because Simmons was decided long before the judgment in Bronshtein's case became final for retroactivity purposes on October 27, 1997, the date when the Supreme Court denied certiorari. See Beard v. Banks, 124 S. Ct. 2504, 2510 (2004) ("State convictions are final 'for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied.'")

24

(citation omitted). Accordingly, the Commonwealth's argument is meritless.

B.

The Commonwealth's remaining contention is that the prosecution's arguments and the testimony that it elicited at the penalty phase did not put the issue of Bronshtein's future dangerousness at issue in the way needed to trigger Simmons and the subsequent related cases of Shafer v. South Carolina, 532 U.S. 36 (2001), and Kelly v. South Carolina, 534 U.S. 246 (2002). Because the Pennsylvania Supreme Court did not adjudicate this claim on the merits, the standards of review set out in 28 U.S.C. § 2254(d) are inapplicable. Furthermore, because the Commonwealth does not argue that either Shafer or Kelly announced "new rules" within the meaning of Teague v. Lane, 489 U.S. 288 (1989), we need not and do not decide whether such an argument would have merit, see Horn v. Banks, 536 U.S. 266, 271 (2002), and we consider Shafer and Kelly to be applicable in this appeal.

In Simmons, the prosecutor explicitly argued that the jury should impose a death sentence in order to protect society from the defendant. The prosecutor stated that a death sentence would be "a response of society to someone who is a threat" and would be "an act of self-defense." 512 U.S. at 157. The Supreme Court held that under these circumstances the trial judge was required to instruct the jury that the defendant, if not sentenced to death, would have received a sentence of life imprisonment without the possibility of parole. The plurality opinion stated that "where the defendant's future dangerousness *is at issue*, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Id. at 156 (emphasis added). However, as we noted in Rompilla v. Horn, 355 F.3d 233, 265 (3d Cir.), cert. granted, 125 S. Ct. 27 (2004), Justice O'Connor's controlling concurrence may be read as adopting a narrower holding, namely, that the dispositive question is not whether a defendant's future dangerous is "at issue" but whether "*the prosecution argues* that the defendant will pose a threat to society in the future." 512 U.S. at 177 (O'Connor, J.,

25

concurring in the judgment).  See also Shafer, 532 U.S. at 49.

As we also observed in Rompilla, 355 F.3d at 266, the holding in Simmons was arguably broadened in Kelly.  There the prosecutor stated in his penalty phase opening: "I hope you never in your lives again have to experience what you are experiencing right now.  Being some thirty feet away from such a person. Murderer."  534 U.S. at 248.  The prosecution then presented evidence that while in prison, Kelly had made a knife, had attempted to escape from prison, and had planned to hold a female guard as a hostage.  See id.  The state also brought out evidence of "Kelly's sadism at an early age, and his inclination to kill anyone who rubbed him the wrong way."  Id. at 248-49 (citation omitted). During its closing argument, the state referred to Kelly as "the butcher of Batesburg," "Bloody Billy," and "Billy the Kid."  Id. at 249-50.  In addition, the prosecutor told the jury that "Kelly doesn't have any mental illness.  He's intelligent . . . .  He's quick-witted. Doesn't that make somebody a little more dangerous . . . . [D]oesn't that make him more unpredictable for [the victim] . . . . murderers will be murderers.  And he is the cold-blooded one right over there."  Id. at 250.

The Kelly Court concluded that the trial judge had an obligation to give a parole ineligibility instruction.  The Court stated that "[t]he prosecutor accentuated the clear implication of future dangerousness raised by the evidence and placed the case within the four corners of Simmons."  Id. at 255.  The Court observed that "[e]vidence of future dangerousness under Simmons is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms."  Id. at 254.  The Court also acknowledged that "it may well be that the evidence in a substantial proportion, if not all, capital cases will show a defendant likely to be dangerous in the future."  Id. at 254 n.4.  But the Court declined to decide whether a defendant is entitled to a parole ineligibility instruction "when the State's evidence shows future dangerousness but the prosecutor does not argue it."  Id.

In the present case, the prosecution not only put

26

Bronshtein's future dangerousness "at issue" but "argue[d] that the defendant [would] pose a threat to society in the future." <u>Simmons</u>, 512 U.S. at 177 (O'Connor, J., concurring in the judgment). During its closing argument at the penalty stage, the prosecutor made the following statements:

> Ladies and gentlemen, the medical testimony in this case was significant because it tells you something about the psyche or persona of this man. *He can't conform to what is required in society. The doctors have told you that he's anti-social.* He's prone to lying. He's prone to stealing. *He's prone to living a life of crime.*
>
> Whatever the seeds were that got him there, they're planted, and that tree has grown. He's grown into a twenty-two-year-old person now regardless of how the seeds were planted.
>
> You have to take a look at what effect that has had and what effect it had at the time he committed these crimes. *The doctors have told you he's a man that can't conform to the needs of society*.

App. VI at 1909-10 (emphasis added).

Even without considering "the medical testimony" to which the prosecutor referred, it is evident that these comments, although more clinical than those in <u>Simmons</u>, conveyed the message that Bronshtein presented a threat of future lawlessness. We agree with the District Court's evaluation of these comments:

> [T]he references to Bronshtein's inability to 'conform to what is required in society' and the fact that he was 'anti-social,' in the context of the present and the future by reference to what Bronshtein is "going to" and "prone to" do, make clear that the Commonwealth was suggesting to the jury that it should impose the death penalty because of Bronshtein's inability to function in society in the

27

future. The prosecutor's assertion that [Bronshtein] was "prone to living a life of crime," when placed in the context of the stark choice of life in prison or death, would suggest to any juror that petitioner would pose a danger to society if he was released from prison. The none-too-subtle implication of these arguments is that Bronshtien should be put to death because if he were ever released, he could not "conform to the needs of society,' and was "going to" continue "living a life of crime" and engaging in dangerous, violent conduct.

Dist. Ct. Op. at 36-37. Thus, the import of the penalty phase closing in itself is clear enough.

When the "the medical testimony" to which the prosecutor referred in the closing is also taken into account, the significance of the prosecutor's statements becomes even clearer. At the penalty phase, Bronshtein called a psychologist, Gerald Cooke, to testify to "psychological mitigating factors." App. VI at 1835. Dr. Cooke testified that Bronshtein suffered from paranoid personality disorder, anti-social personality disorder, and depression. See id. at 1838, 1840. On cross-examination, the Commonwealth elicited from Dr. Cooke a litany of dangerous tendencies that persons with these disorders often exhibit. The questioning went as follows:

> Q: One of the features of [a person with an anti-social personality disorder] is he tends to be irresponsible; correct?
>
> A: Well, one of the features of anti-social personality can be irresponsibility. I don't know if that's necessarily a criteria that fits him. He fits a number of the other criteria.
>
> Q: It can be anti-social behavior; correct?
>
> A: Absolutely.
>
> Q: Including criminal activity; correct?

28

A:     Correct.

Q:     Lying?

A:     Yes.

Q:     Stealing?

A:     Yes.

Q:     Fighting?

A:     Yes.

Q:     Being very aggressive; correct?

A:     Yes.

Q:     They can be prone to being irritable; correct?

A:     Yes.

Q:     Prone to getting repeatedly into physical fights; correct?

A:     Can be. . . .

Q:     Failed to conform to social norms; correct?

A:     That is true.

Q:     Repeatedly can perform anti-social acts; correct?

A:     Yes. . . .
Q:     They also tend to express no remorse, don't they?

A:     That's true.

29

Q: No remorse about the effects of their behavior on other people?

A: They often don't have insight to the effects of their behavior on themselves or on other people.

Q: In other words, a lot of people who have anti-social personality disorders can't play by the rules in a civilized society; correct?

A: True.

Id. at 1855-1858.

The prosecutor then questioned Dr. Cooke regarding Bronshtein's paranoid personality disorder:

Q: Dr. Cooke, with regard to the paranoid personality disorder, they're also people that can react quickly with anger; correct?

A: Yes.

Q: And are likely to counterattack if they feel threatened; correct?

A: They are likely to see themselves as being threatened, and many of them sort of follow the kind of attitude that the best defense is offense.

Q: In other words, they're more likely to feel threatened than the normal person; correct?

A: True, and that's what being paranoid means.

Q: Because they're more likely to feel threatened, they're more likely to counterattack because of the threat they feel;

30

correct?

A: That is true.

Q: They can bear grudges for a long time; correct?

A: True.

Q: And they can even get to the point where they never forgive different insults people have done to them; correct?

A: True.

Q: They're viewed as secretive?

A: Yes.

Q: Devious?

A. Sometimes.

Q: Scheming?

A: Sometimes.

Q: Have great difficulties accepting self-criticism?

A: That's true.

Q: Dr. Cooke, Mr. Bronshtein has a combination of the two – paranoid personality disorder and anti-social personality disorder – doesn't he?

A: And depression.
  . . .

Q: Doctor, it's certainly a potentially lethal

31

combination of personality disorders, isn't it?

A:    Could be.

Id. at 1858-1860.

The Commonwealth also presented rebuttal evidence through its own mental health expert, Dr. Timothy J. Michaels. The Commonwealth elicited the following testimony from Dr. Michaels:

Q:    [W]hat is your agreement or disagreement with the diagnoses which [Dr. Cooke] has made?

A:    . . . I certainly agree with the anti-social personality disorder. What that means is, this young man has gotten in trouble throughout his life. He doesn't learn by experience. He's impulsive. He continues to get in trouble within the prison system. He acts out, justifies his behavior. So even after he has been incarcerated, there's ongoing difficulties.

. . . When you're anti-social, you don't follow the rules. You don't learn by experience. You think you're right and other people are wrong. . . .

I also agree with the paranoid personality disorder. . . .

He's paranoid. Basically, he's looking over his shoulder. He doesn't trust people, doesn't trust most people. . . .

This combination of not trusting people and then acting out, not following the rules is an explosive combination in my opinion. . . . So

32

I see that as a serious, very serious behavioral problem that this young man has.

. . .

Q:  Dr. Michaels, what findings did you make with regard to this personality disorder or these personality disorders with having remorse?

A:  . . . Individuals who are anti-social don't have remorse. They don't learn. They're not sorry for their behavior. They don't learn from experience. So they do this over again.

And instead of being remorseful, unfortunately there is acceleration of behavior. I think I can get away with it – even though you get caught. I can outsmart the people[.]

App. VI at 1869-71, 1874.

Taken together, the testimony of Drs. Cooke and Michaels suggested the following: that Bronshtein's "combination of personality disorders" could be "lethal" or "explosive"; that he was prone to lie, scheme, steal, fight, and act very aggressively; that he was much more likely than a normal person to distrust others, bear grudges, feel threatened, and respond with a counterattack; that he was unable to "play by the rules in a civilized society"; that he was probably remorseless, and unlikely to learn from experience, and thus prone to commit the same crimes "over again"; and that there would probably be an "acceleration" of his anti-social behavior.

The prosecution's penalty phase closing must be viewed as incorporating these points. As noted, the prosecutor asked the jury to recall "the medical testimony," referred twice to what "the doctors" had told the jury, and summarized that testimony as saying that Bronshtein is "anti-social," "prone to living a life of crime," and "can't conform to the needs of society." In any realistic sense of the concept, the prosecutor "argue[d] that the defendant [would]

33

pose a threat to society in the future." Simmons, 512 U.S. at 177 (O'Connor, J., concurring in the judgment). And it goes without saying that the Bronshtein's future dangerousness was put at issue within the meaning of Kelly. In the words of that decision, "[t]he prosecutor accentuated the clear implication of future dangerousness raised by the evidence." 534 U.S. at 255. We thus reject the Commonwealth's argument that the prosecution's presentation at the penalty phase was insufficient to trigger the obligation imposed by Simmons, Shafer, and Kelly.

Having considered and rejected the Commonwealth's arguments regarding Simmons and its progeny, we have before us no ground for reversing the order of the District Court insofar as it held that Bronshtein's death sentence is unconstitutional under those precedents. In light of our decision on this issue, we have no occasion to decide whether, as the District Court held, that sentence is unconstitutional for the additional reason that the jury was improperly instructed regarding the aggravating factor set out in 42 Pa. Cons. Stat. Ann. § 9711(d)(6) (commission of homicide while perpetrating felony) and that there was insufficient evidence to prove that factor.[9]

V.

We now consider the claims raised in Bronshtein's cross-appeal. As noted, Bronshtein asks us to issue a certificate of appealability on these claims, and we must do so if he has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). On the merits, our review of the decision of the District Court is plenary, as the District Court relied exclusively on the state court record and did not hold an evidentiary hearing. Hartey v. Vaughn, 186 F.3d 367, 371 (3d Cir. 1999).

A.

---

[9]The law concerning § 9711(d)(6) is not in dispute and, now that the specific language used by the trial court has been challenged, there is no reason to expect that the same instruction will be repeated if a new penalty-phase proceeding is held.

34

Bronshtein argues that the prosecution violated <u>Batson v. Kentucky</u>, <u>supra</u>, by exercising a peremptory challenge based on religion and ethnic background. During collective voir dire, the trial court asked the prospective jurors whether they had "any moral, religious or other ethical beliefs which would prevent [them] from considering the imposition of the death penalty[.]" Bronshtein's App. II at 293. Ten of the 30 prospective jurors – including Jan Eidelson – responded in the affirmative.

Later, during individual voir dire, defense counsel asked another prospective juror, Nanette Phyllis Honigman, whether she was "of Jewish heritage," and she responded that she was not. App. II at 420-21. After Ms. Honigman was dismissed for cause on unrelated grounds, the trial judge raised the issue whether it was appropriate to ask potential jurors about their religions. <u>Id</u>. at 421. The judge suggested that such an inquiry would not be reasonable unless a juror expressed an unwillingness to consider a death verdict for religious reasons. <u>Id</u>. Defense counsel explained that his only reason for doing so "would be for the possible <u>Batson</u> issues, it's whether the juror was of the same Jewish heritage as Mr. Bronshtein." <u>Id</u>. The prosecutor seems to have taken the position that <u>Batson</u> does not apply to peremptory challenges based on religion, while defense counsel and Bronshtein himself contended that striking a prospective juror because the person is Jewish would be a challenge based on "nationality" or "race" and would thus fall within <u>Batson</u>. <u>Id</u>. at 423-24. The trial judge then stated that Judaism is "a religion, it's not a nationality" and ruled that a peremptory challenge based on Judaism did not present "a <u>Batson</u> issue." <u>Id</u>. at 424-25. However, because the judge thought that an inquiry into a juror's religion might be justified for the limited reason of exploring whether the juror would be willing to consider a death sentence, the judge asked counsel to provide advance warning before asking any questions along those lines. <u>Id</u>. at 425.

Immediately after this exchange, the prosecutor stated that he wanted to ask Ms. Eidelson about her religion "only because of the educational background" noted in her information sheet, namely, that she had written that she had attended a school called "Friends Central." App. II at 426. The trial judge responded that

35

this inquiry was legitimate because "it cannot be disputed that if someone is a Quaker they hold a religious belief that would prevent them, probably, from serving on this jury." Id.

When Ms. Eidelson came up for individual voir dire a short time later, the trial judge questioned her first. In response to the court's questions, she stated that she could vote to impose a death penalty but that "it would not be a comfortable thing" and "would [not] be easy." App. II at 429, 435. She expressed reservations about being sequestered for the two weeks that the trial was expected to last, stating that she "wouldn't want to be in a situation where [she] could not have contact with [her] support system[.]" Id. at 429. She also stated that, although she was a graduate of Friends Central High School, she was not a Quaker. Id. at 437. Finally, when the judge asked her whether she "would have any tendency to be biased or prejudiced against [Bronshtein] because he is a Russian-Jew," Ms. Eidelson answered that she did not think that she would and added: "Well, I need to let you know, my dad's parents came from Russia." Id. at 439.

Defense counsel questioned Eidelson next. In response to his questioning, she stated that her "dad's parents were Russian-Jews" and that her mother was Jewish. App. II at 440. The prosecutor then questioned Ms. Eidelson briefly and inquired only whether, if the jury voted for the death penalty and the jurors were polled, she would be able to stand up in open court and state that she had voted to impose that sentence. App. II at 443-45. She answered in the affirmative. Id. at 445.

After Ms. Eidelson left the courtroom, defense counsel stated that she was acceptable, but the prosecutor exercised a peremptory strike against her. App. II at 445. Defense counsel objected, claiming that the prosecution had exercised the strike in violation of Batson, but the trial judge rejected the objection without explanation. Id. at 446.

On direct appeal, the Pennsylvania Supreme Court found it unnecessary to resolve the question whether "'Russian-Jewish' is an ethnic classification for the purposes of a Batson claim[.]" Bronshtein, 691 A.2d at 915. First, the Court held that Bronshtein

36

"failed to develop a record setting forth the race or ethnicity of the rest of the venire or the jurors eventually empaneled as required by [Commonwealth v. Simmons, 662 A.2d 621 (Pa. 1995)]." Second, the Court stated:

> [T]he record reveals that the prospective juror equivocated on the death penalty on moral, religious and philosophical grounds and expressed serious reservations about serving on the jury because it would entail being separated from her 'support group' during the anticipated two weeks of sequestration. . . . Reasons such as these have been found by this court to be a proper basis for exercising a peremptory challenge.

Id.

The District Court discussed Bronshtein's claim in some detail. See Aug. 16, 2001 Mem. at 2-8. The District Court expressed disagreement with the state courts on three grounds. The District Court opined that "it is likely that the trial judge was wrong on the issue of whether Jews were a cognizable group under Batson." Id. at 4. The District Court also disagreed with the state supreme court's view that Batson "requires a defendant [to] produce evidence of the race of all venirepersons struck by the prosecutor, the race of prospective jurors stricken by the defense, and the racial makeup of the final jury selected." Id. at 8. The District Court "read Batson to be far less exacting in its evidentiary requirements" and stated that "there are many evidentiary avenues a petitioner may travel to bolster his Batson claims." Id. Finally, the District Court disagreed with the state supreme court's approach in rejecting Bronshtein's claim on the ground that the record revealed legitimate grounds on which the strike of Ms. Eidelson could have been based. Id. at 6. The District Court wrote:

> Batson requires the prosecutor to reveal her *actual* reasons for striking a juror. Where the prosecutor has not done so, whether on her own initiative or because of the trial court's ruling, an appellate or

habeas court should not later divine reasons that might have motivated the prosecutor, however tempting that may be, and regardless of how abundant or logical the possible reasons may seem.

Id. (emphasis in original).

The District Court nevertheless rejected Bronshtein's Batson claim on the ground that he had failed to make out a prima facie case. The Court noted that "[t]he only record evidence petitioner pointed to at trial" or in the federal habeas proceeding was "the undisputed fact that the prosecutor used a peremptory challenge to exclude from the jury the only person in the *venire* who shared petitioner's Russian-Jewish ancestry." Aug. 16, 2001 Mem. at 6-7. The District Court also noted that "it was petitioner's counsel, not the prosecutor, who asked two jurors whether they were Jewish" and that "[n]othing in the record indicate[d] that the prosecutor was interested in whether the jurors shared a common ethnic heritage with the defendant." Id. at 7-8.

Because one of the grounds given by the Pennsylvania Supreme Court for rejecting Bronshtein's claim was his failure to develop the record in accordance with one of that Court's prior decisions, Commonwealth v. Simmons, 662 A.2d 621 (Pa. 1995), we begin by discussing the question of procedural default. We hold that consideration of Bronshtein's Batson claim is not barred for two reasons. First, the Commonwealth has not argued that the claim is procedurally barred, and we are not required to raise this issue sua sponte. See Smith v. Horn, 120 F.3d at 408-09. Second, we understand Commonwealth v. Simmons to represent an interpretation of what Batson requires, not an independent state procedural rule. In Commonwealth v. Simmons, the Pennsylvania Supreme Court accurately summarized Batson's holding as follows:

To sustain a *prima facie* case of improper use of peremptory challenges, a defendant must establish the following: (1) the defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove members of the

38

defendant's race from the venire; (2) the defendant can then rely on the fact that the use of peremptory challenges permits "those to discriminate who are a mind [sic] to discriminate; and, (3) the defendant, through facts and circumstances, must raise an inference that the prosecutor excluded members of the venire on account of their race. . . .

662 A.2d at 631. The Court then continued:

> *This third prong* requires defendant to make a record specifically identifying the race of all the venirepersons removed by the prosecution, the race of the jurors who served and the race of jurors acceptable to the Commonwealth who were stricken by the defense.

Id. (emphasis added). It thus seems clear that the Commonwealth v. Simmons procedural requirements represent an interpretation of Batson, not a state procedural rule.

We therefore proceed to the merits of Bronshtein's claim. Because this claim was "adjudicated on the merits" in state court, the narrow standards of review set out in 28 U.S.C. § 2254(d) apply. We must thus decide whether the state supreme court's "adjudication of the claim . . . resulted in a decision that was *contrary to*, or involved *an unreasonable application* of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added).

A state court adjudication is "contrary to" Supreme Court precedent if it results from the application of "a rule that contradicts the governing law set forth" by the Supreme Court or is inconsistent with a Supreme Court decision in a case involving "materially indistinguishable" facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). "A state court decision fails the 'unreasonable application' prong only 'if the court identifies the correct governing rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular case or if the state court either unreasonably extends a legal principle from the Supreme Court's

39

precedent to a new context where it should not apply or unreasonably refuses to extend the principle to a new context where it should apply.'" Rico v. Leftridge-Byrd, 340 F.3d 178, 181 (3d Cir. 2003) (citations omitted).

Before applying these standards to the present case, we note that we agree with the District Court that the Pennsylvania Supreme Court clearly misinterpreted Batson. First, Batson does not invariably demand compliance with the procedural requirements set out in Commonwealth v. Simmons, 662 A.2d at 631. It is noteworthy that Batson discussed what a criminal defendant must do to establish a prima facie case without hinting that a defendant must always satisfy anything like the rigid Commonwealth v. Simmons requirements. More important, Batson's specific examples of how a prima facie case may be established make it clear that the Commonwealth v. Simmons requirements need not always be met. Batson stated that "a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." 476 U.S. at 97. In other words, a stark pattern – say, peremptorily striking numerous African American jurors and no others – could suffice without the creation of a record regarding "the race of the jurors who served and the race of the jurors acceptable to the [prosecution] who were stricken by the defense." Commonwealth v. Simmons, 662 A.2d at 631. Batson further stated that a "prosecutor's questions and statements during voir dire examination and in exercising his challenges may support or refute an inference of discriminatory purpose." 476 U.S. at 97. Thus, in some circumstances, suspicious questioning, coupled with strikes that seem to implement the thrust of the questioning, may be enough. In short, a prima facie case may be established by "all relevant circumstances." Id. at 96. While the factors noted in Simmons are certainly relevant, in the words of the District Court, "there are many evidentiary avenues a petitioner may travel to bolster his Batson claims." Aug. 16, 2001 Mem. at 8.

Second, the Pennsylvania Supreme Court clearly misinterpreted Batson insofar as it rejected Bronshtein's claim on the ground that the record suggested legitimate reasons that *could* have motivated the prosecutor to exercise the contested peremptory

40

challenge. Under <u>Batson</u>, if the objecting party establishes a prima facie case, the party exercising the challenge must state its actual reasons, and the trial judge must make a finding regarding the challenging party's motivation. <u>See</u> 476 U.S. at 97-98.

In light of our conclusion that the state supreme court misinterpreted <u>Batson</u>, we conclude that the state supreme court's decision fails to satisfy the standards set out in 28 U.S.C. § 2254(d)(1). The "contrary to" prong is violated because the state supreme court "applie[d] a rule that contradicts the governing law set forth" by the Supreme Court, <u>Williams</u>, 529 U.S at 405. And the "unreasonable application" prong is also contravened because the state supreme court did not "identif[y] the correct governing rule from the Supreme Court's cases." <u>Rico</u>, 340 F.3d at 181. It does not follow, however, that Bronshtein is entitled to relief.

A state prisoner's federal habeas petition may be granted "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Thus, if a petitioner's custody does not in fact violate federal law – i.e., if the petitioner's claims fail even de novo review – the petitioner is not entitled to habeas relief regardless of the correctness of the state court's analysis of those claims. This conclusion follows naturally from the longstanding rule that federal courts will not entertain habeas petitions to correct errors that do not undermine the lawfulness of a petitioner's detention. <u>See McNally v. Hill</u>, 293 U.S. 131, 135 (1934) (errors may not be attacked on one count of indictment where sentence was lawfully imposed after conviction on another count), <u>overruled on other grounds</u>, <u>Peyton v. Rowe</u>, 391 U.S. 54 (1968).

Our conclusion also follows naturally from the language of 28 U.S.C. § 2254(d). Under the "contrary to" prong of § 2254(d)(1), it is the state supreme court's "decision," not its reasoning, that must be "contrary to" clearly established Supreme Court precedent. As we put it in <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 888 (3d Cir. 1999) (en banc) (emphasis added), the "contrary to" prong applies when "Supreme Court precedent requires the contrary *outcome*." Likewise, our decision in <u>Werts v. Vaughn</u>, 228 F.3d 178, 196-97 (3d Cir. 1999) (quoting

O'Brien v. Dubois, 145 F.3d 16, 24-25 (1st Cir. 1998)) (emphasis added), glossed the "contrary to" language as entitling a petitioner to relief only if the petitioner "shows that 'Supreme Court precedent requires an *outcome* contrary to that reached by the relevant state court.'"

Accordingly, both the terms of the habeas statute and common sense dictate that Bronshtein cannot obtain relief on his Batson claim unless application of a correct interpretation of that decision leads to the conclusion that his rights were violated.

Applying plenary review, we agree with the District Court that Bronshtein failed to make out a prima facie case.[10] First, it is relevant that Bronshtein's claim is based on a single strike. We do not hold that a prima facie case always requires more than one contested strike, but the absence of a pattern of strikes is a factor to be considered. In this connection, it is relevant (though not, as the state supreme court held, dispositive) that the record does not reveal whether the prosecutor passed up the opportunity to strike other prospective jurors who were Jewish or who had ancestors who once lived in Russia. See Simmons v. Beyer, 44 F.3d 1160, 1167 (3d Cir. 1995) (pattern of strikes and number of racial group members in panel relevant); United States v. Clemons, 843 F.2d 741, 747-48 (3d Cir. 1988) (same).

Second, the nature of the crime did not provide a reason for heightened suspicion about the prosecution's reason for striking Ms. Eidelson. See Simmons v. Beyer, 44 F.3d at 1167 (nature of crime and race of accused and victim relevant); Clemons, 843 F.2d at 748 (same). There was no suggestion that religion or ethnicity played any role in the murder, and the accused and the victim shared the same religion and ethnic background.

---

[10]We therefore have no need to address the question whether Bronshtein would be entitled to relief if he had shown that the peremptory challenge at issue was based on "religious affiliation," see United States v. DeJesus, 347 F.3d 500, 510 (3d Cir. 2003) (reserving decision on question), or ethnicity. See Rico v. Leftridge-Byrd, 340 F.3d 178, 182-84 (3d Cir. 2003).

Third, the prosecutor's questions and statements during voir dire did not suggest that Ms. Eidelson was peremptorily challenged because of her religion or ethnicity.  See Simmons v. Beyer, 44 F.3d at 1167 (prosecutor's questions relevant); Clemons, 843 F.2d at 748 (same).  It was defense counsel who first asked a juror whether she was Jewish.  The prosecutor expressed an interest in whether Ms. Eidelson was a Quaker, not whether she was Jewish, and his only question to her concerned her ability to vote for the death penalty.  We agree with the District Court that these facts are insufficient to make out a prima facie case, and we therefore reject Bronshtein's Batson claim on this ground.[11]

## VI.

We now consider two issues relating to the trial court's evidentiary rulings.  First, Bronshtein argues that the trial court violated his federal constitutional rights to a fair trial, to present a defense, to due process, and to confrontation by excluding proposed testimony by private investigator Alan Hart.  Second,

---

[11]Bronshtein contends that the strike of Ms. Eidelson was suspicious because, immediately after the trial judge ruled that Batson does not prohibit peremptory challenges based on religion, the prosecutor expressed an interest in asking about the religion of a prospective juror "with a Jewish-sounding last name." Bronshtein's Br. at 84-86.  These circumstances are relevant, but particularly in light of the reason volunteered by the prosecutor, i.e., Ms. Eidelson's attendance at Friends Central High School, we are not persuaded that a prima facie case was established.

Bronshtein also contends that the following facts support a prima facie case: (1) the Commonwealth exercised a peremptory strike against a non-Jewish prospective juror who had lived for some time in a predominantly Jewish neighborhood and (2) the Commonwealth did not strike other venirepersons who shared some of Ms. Eidelson's characteristics, e.g., her marital and employment status, educational background, and lack of military service.  See Bronshtein's Br. at 86-88.  These factors provide slight support at best for Bronshtein's position.

43

Bronshtein contends that the trial court violated his right to due process by admitting his confession to the Slobotkin murder for the limited purpose of showing the identity of the person who shot and killed Gutman.

A.

Before reaching the merits of these claims, we must consider whether review is precluded by non-exhaustion or procedural default. Without an express waiver by the state, a federal court is allowed under 28 U.S.C. § 2254(b)(1)(A) to grant a state prisoner's habeas petition only if the petitioner has exhausted all available state remedies. In order to satisfy the exhaustion requirement, a federal habeas claim must have been "fairly presented" to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). This means that a petitioner must "present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999). "It is not enough that all the facts necessary to support the federal claim were before the state courts," Anderson v. Harless, 459 U.S. 4, 6 (1982), and "mere similarity of claims is insufficient to exhaust." Duncan v. Henry, 513 U.S. 364, 366 (1995).

In this case, our review of the state court record reveals that the arguments that Bronshtein made with respect to these issues were based entirely on state, rather than federal, law.[12] As a result, these claims were not properly exhausted. See Keller v. Larkins, 251 F.3d 408, 413-15 (3d Cir. 2001).

Bronshtein contends, however, that these claims "were automatically exhausted on direct appeal by virtue of the Pennsylvania Supreme Court's mandatory appellate review in capital cases." Reply And Mem. Of Law In Support Of Pet. For Writ Of Habeas Corpus at 11. Under 42 Pa. Cons. Stat. §

---

[12]See Appellant's Br. at 14-20, 27-29, 32-37, Commonwealth v. Bronshtein, 88 Capital Appeal Docket, Pa. Sup. Ct., Eastern District.

9711(h)(3)(i), the Pennsylvania Supreme Court is required to review the record in capital cases to determine whether "the sentence of death was the product of passion, prejudice or any other arbitrary factor[.]" Such review, Bronshtein asserts, "satisfies the exhaustion requirement for all record-based claims of constitutional error." Reply And Mem. Of Law In Support Of Pet. For Writ Of Habeas Corpus at 15. The District Court agreed, stating that "[e]ven when a petitioner fails to raise a particular constitutional issue, the mandatory review of capital convictions and sentencings required in Pennsylvania is sufficient to exhaust fundamental constitutional claims of the kind raised here by Bronshtein." App. I at 22 n.19.

We must disagree with this analysis. First, neither 42 Pa. Cons. Stat. § 9711(h)(3)(i) nor any other Pennsylvania statute states that the Pennsylvania Supreme Court is expected to try to identify and then assess every "record-based" federal constitutional argument that might possibly be made on behalf a capital defendant. Instead, 42 Pa. Cons. Stat. § 9711(h)(3)(i) imposes a much more limited, albeit important, obligation, i.e., to make sure that no death sentence is "the product of passion, prejudice or any other arbitrary factor."

Second, we see no evidence that the Pennsylvania Supreme Court believes that it is required to engage in, or that it in fact engages in, the sort of boundless inquiry that Bronshtein thinks is required. See Commonwealth v. Paolello, 665 A.2d 439, 454 n.12 (Pa. 1995) ("[W]e decline counsel's invitation to scour the record for additional errors caused by counsel and sua sponte raise said issues; the request is inappropriate and nonsensical in that such advocacy would be beyond the scope of our appellate review.") The state supreme court's opinion on direct appeal in this case is illustrative. The state supreme court did not address any federal constitutional issue that Bronshtein did not raise; nor did the state supreme court address the question whether Bronshtein's state-law arguments would have merit if recast in federal constitutional terms. It seems fanciful to suggest that, in every capital appeal, the state supreme court actually considers and rejects a host of federal constitutional claims without receiving briefing or argument on those claims from counsel and without even mentioning in the

opinion of the court that the claims were entertained.

Third, Bronshtein's argument is inconsistent with Pennsylvania's scheme of post-conviction review. Under the PCRA, a petitioner may not obtain relief on a claim that was "previously litigated," 42 Pa. Cons. Stat. Ann. § 9543(a)(3), and a claim is viewed as having been "previously litigated" if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue." 42 Pa. Cons. Stat. Ann. § 9544. Thus, if a Pennsylvania Supreme Court decision affirming a capital conviction and sentence on direct review is deemed to signify that the Court considered and rejected every possible federal constitutional argument that could be made based on the record, it would follow that no such claims could ever be asserted under the PCRA. See Holland v. Horn, 150 F. Supp. 2d 706, 720-21 (E.D. Pa. 2001); Banks v. Horn, 49 F. Supp. 2d 400, 406-07 (M.D. Pa. 1999). We are convinced that the Pennsylvania Legislature did not intend such a result.

Fourth, Bronshtein's argument would frustrate important aspects of the federal habeas scheme. Under the federal habeas statute, an applicant for federal habeas relief must show that "*the applicant* has exhausted" all available state remedies. 28 U.S.C. § 2254(b)(1)(A) (emphasis added). In addition, a state is not "deemed to have waived the exhaustion requirement" unless it "expressly" does so, 28 U.S.C. § 2254(b)(3), and a federal habeas court's scope of review varies greatly depending on whether a particular claim was or was not "adjudicated on the merits" in the state courts. See 28 U.S.C. § 2254(d). Under Bronshtein's argument, however, the fiction that the state supreme court on direct review automatically considers all possible "record-based" arguments (and tacitly rejects all those that it does not expressly endorse) essentially does away with these aspects of the federal habeas scheme. The exhaustion requirement is rendered meaningless since all possible claims are deemed to be exhausted on direct review. Moreover, because an affirmance on direct review is deemed to constitute an adjudication on the merits of all possible record-based claims, it would seem to follow that all such claims are subject to the narrow scope of federal habeas review set out in 28 U.S.C. § 2254(d) regardless of whether the state supreme

46

court in fact ever considered those claims.

For these reasons, we agree with the courts of appeals that have rejected arguments similar to Bronshtein's.  See, e.g., Beaty v. Stewart, 303 F.3d 975, 987 (9th Cir. 2002); Smith v. Moore, 137 F.3d 808, 821 (4th Cir. 1998); Nave v. Delo, 62 F.3d 1024, 1039 (8th Cir. 1995); Julius v. Johnson, 840 F.2d 1533, 1546 (11th Cir. 1988).  We have considered the Ninth Circuit's decision in Beam v. Paskett, 3 F.3d 1301, 1305-07 (9th Cir. 1993), but that decision does not persuade us to accept Bronshtein's argument here.

In Beam, the claim at issue concerned the constitutionality of an aggravating factor set out in the Idaho capital sentencing statute.  After first concluding that the habeas petitioner had fairly presented his federal claim to the Idaho Supreme Court, the Beam panel stated that the claim would not be procedurally defaulted even if the petitioner had not raised it in the state supreme court.  The Beam panel noted that the Idaho Supreme Court was required by statute to review the entire record in a capital case to make sure that the death sentence was not the result of an "arbitrary factor." Id. at 1306.  The panel then predicted that the Idaho Supreme Court would interpret the state statute to mean that "affirmance of a capital sentence constitutes an implicit rejection of all specific claims falling within the subject of its mandatory review authority and that any claim covered by the mandatory review statute must be deemed resolved against the defendant even if he did not raise that claim before the court and even if the court failed to address it in its opinion."  Id. at 1306.  Reasoning that reliance on the sentencing factor at issue "would clearly constitute reliance on an arbitrary factor," the Beam panel concluded that this claim fell within the specific terms of the Idaho Supreme Court's mandatory review authority and that therefore the state supreme court must have considered and rejected the claim.  Id. at 1307.

Beam is distinguishable from the present case on several grounds.  First, as noted, the petitioner there was held to have fairly presented his claim to the state supreme court.  Second, the relevant discussion in Beam was based on a prediction about how the Idaho Supreme Court would interpret its mandatory review authority, and we do not predict that the Pennsylvania Supreme Court would

47

interpret its mandatory review authority in a similar fashion.  Third, the relevant discussion in Beam was also predicated on the Court's view that the particular claim at issue, the constitutionality of a capital sentencing factor, fell within the list of specific questions that the Idaho Supreme Court was obligated to consider on direct review.  The pertinent claims here are different, and even if we were bound by Beam – and of course we are not – it would not follow that the particular claims in question here fall within the scope of the Pennsylvania mandatory review provision.  However, to the extent that Beam's reasoning differs from our analysis of Bronshtein's argument here, we find Beam unpersuasive.  We thus hold that the claims under discussion were not properly exhausted.

Although Bronshtein has never properly exhausted the claims at issue, he is now "clearly foreclosed" from doing so by the PCRA time limit, see 42 Pa. Cons. Stat. Ann. § 9545(b), and these claims are therefore procedurally defaulted.  See Whitney, 280 F.3d at 250-52.  As a result, we may not grant relief on those claims unless Bronshtein "makes the standard showing of cause and prejudice or establishes a fundamental miscarriage of justice."  Id. at 253 (citation and internal quotation marks omitted).

We would permit Bronshtein to attempt on remand to establish a reason to excuse his procedural default, but we find it unnecessary to do so because it is apparent that the claims in question lack merit.  Under 28 U.S.C. § 2254(b)(2), we may reject claims on the merits even though they were not properly exhausted, and we take that approach here.  We will discuss in turn the two evidentiary rulings that Bronshtein contests.

B.

1. *Hart's testimony*.  In his proffer of Hart's testimony at an in camera hearing before the trial judge, defense counsel stated that Hart would testify that he had been hired by the New Jersey Jewelers' Association to conduct an investigation into a "scam" that Karlitsky was suspected of carrying out.  App. V at 1376-77.  According to the proffer, Hart would have testified that jewelry that had been reported as stolen from Karlitsky's store had "ended up" at a downtown Philadelphia store owned by Karlitsky's cousin.

48

Id. In addition, it was proffered that Hart would have testified that, "contrary to . . . the Commonwealth's testimony," the Philadelphia Police Department was involved in the investigation of this matter. Id. Defense counsel asserted that Hart's testimony would support the theory that Karlitsky gave some of the jewelry from a scam at the Leo Mall to Gutman to sell at his store and that a dispute between them motivated Karlitsky to kill Gutman. See id. at 1341-42.

Defense counsel acknowledged, however, that Karlitsky was never charged or arrested in connection with the Leo Mall robbery "because they couldn't get enough evidence to arrest him." Id. at 1377. Furthermore, defense counsel conceded that much of Hart's proffered testimony was hearsay and that the only proper testimony that Hart could have given was that he was "working with the Philadelphia Police in an investigation of Karlitsky." Id. at 1377-80. See also Commonwealth v. Bronshtein, 691 A.2d at 917 n. 18. The trial court excluded this testimony on the ground that evidence about the Leo Mall robbery was "entirely collateral to the proceedings," and the state supreme court held that this ruling was not an abuse of discretion because Bronshtein "failed to offer any evidence that there was any logical connection between the Slobotkin and Gutman murders and this dissimilar case." Bronshtein, 691 A.2d at 917.

"A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." United States v. Scheffer, 523 U.S. 303, 308 (1998). Here, the trial court apparently applied a familiar evidence rule allowing the exclusion of evidence if its probative value is outweighed by the danger of confusion of the issues or needless presentation of cumulative evidence. See Morrison v. Commonwealth, Dept. Of Pub. Welfare, 646 A.2d 565 (Pa. 1994); Commonwealth v. Boyle, 447 A.2d 250 (Pa. 1982); Pa. Rule of Evid. 403 (effective 1998). The trial court's ruling plainly did not rise to the level of a federal constitutional violation.

To begin, Hart's proffered testimony would have been largely cumulative since evidence about the Leo Mall robbery had already been admitted. Montgomery County Detective Donald H.

49

Rohner had testified that, according to an unnamed source (who, unbeknownst to the jury, was Bronshtein himself), Karlitsky was a suspect in the alleged robbery of his own store. Indeed, in an important respect, Rohner's testimony was actually more helpful to the defense than Hart's would have been. Although Hart could not have given competent testimony supporting the defense theory that some of the jewelry from the Leo Mall robbery had found its way to Gutman's store, Rohner testified that, according to his source, jewelry from the Leo Mall robbery had "ended up somewhere else, at least one or more other places[.]" App. IV at 898.[13]

Moreover, even if Hart's testimony had not been largely cumulative, it would have had little probative value. At best, Hart's testimony suggested that Karlitsky might have staged the robbery of his own store. This fact alone sheds no light on the identity of Gutman's killer. Even if Hart's testimony is viewed in conjunction with Detective Rohner's statement that some of the jewelry from the Leo Mall store "ended up" in other places, the evidence does little to show that one of those places was Gutman's store, much less that a dispute over this jewelry led Karlitsky to kill Gutman. This limited probative value must be weighed against the likely danger that the evidence would sidetrack the proceedings and confuse the jury. By admitting Hart's testimony, the court risked submerging the defendant's trial in collateral litigation over an unsolved and (at most) tangentially related crime committed by someone other than the accused. For these reasons, the trial judge's decision to exclude Hart's proffered testimony did not violate Bronshtein's federal constitutional rights.

---

[13]It appears that Hart's testimony would have supplemented Rohner's in only one respect. While Rohner testified that Karlitsky was a suspect in the Leo Mall robbery, he stated that he did not receive any information that the Philadelphia police considered him a suspect, and Hart would have testified that the Philadelphia police did suspect Karlitsky. This additional feature of Hart's proffered testimony is far too slight to convince us that the trial court's ruling violated Bronshtein's federal constitutional rights.

2. *Confession to Slobotkin murder.*  As previously noted, Bronshtein confessed to the Philadelphia police that he had killed Slobotkin, but when Bronshtein was questioned by the Montgomery County police about the Gutman murder he told them that Slobotkin and Gutman had been killed by the same man, namely, "Mr. X," whom Bronshtein later identified as Karlitsky. Bronshtein also said that he was afraid of Mr. X and that he had previously confessed to the Slobotkin murder only because he would have "walked out of [the police station] a dead man" if he had not confessed.  App. IV at 965-66.

The trial judge admitted evidence of Bronshtein's confession to the Slobotkin murder but instructed the jury that it was permitted to consider this evidence solely in relation to Bronshtein's statement that the person who killed Slobotkin also killed Gutman.  When the evidence was admitted, the trial court told the jury:

> This evidence [Bronshtein's confession that he killed Slobotkin] is not to be considered by you to the extent that one might conclude, well, if he did do this other crime for which we're not trying, then, he's a bad person, and that means he probably did this.  No, it can't be used for that purpose.  It comes in for a very limited and specific purpose, which is to say that if you believe that he made this statement, and if you believe that it was true, and if you believe that he made the other statement that has been entered into evidence [that the same person who killed Slobotkin also killed Gutman], and if you believe that is true, then, all of that may be considered by you as evidence as to the identity of the person who did, in fact, kill Mr. Gutman, the decedent who is the subject of this case.  But it is for that specific and limited purpose only that you are being permitted to hear this.

Id. at 1090-91.  In its final charge, the trial court gave a similar

51

warning.[14]

Admission of "other crimes" evidence provides a ground for

---

[14]The trial judge stated:

[Y]ou've heard evidence tending to prove that the defendant was guilty of an offense for which he is not on trial, and I am speaking again of the testimony to the effect that the defendant made a statement to Detective Augustine that he had killed a jeweler named Slobotkin. This evidence, as I instructed you at the time you first heard it, was before you for a limited purpose, that is, for the purpose of tending to show the identity of the killer in this, the Gutman case, and then only because the Commonwealth has put before you another statement allegedly from the defendant that the killer of Slobotkin and the killer of Gutman were one and the same man. In other words, you were allowed to hear about the statement allegedly attributed to the defendant on a case unrelated to this one only because if coupled with the other statement attributed to him and if believed by you, then, it goes to the question of the identity of the killer of Mr. Gutman, which is the issue in this case.

Now, this evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence, that is, the statement about killing Slobotkin, as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer his guilt. If you find the defendant guilty, it must be because you are convinced by the evidence that he committed the crime in this case, the one charged, not because you believe he's wicked or has committed other offenses in other places at other times.

App. V, Pt. 2 at 1676-77.

federal habeas relief only if "the evidence's probative value is so conspicuously outweighed by its inflammatory content, so as to violate a defendant's constitutional right to a fair trial." Lesko v. Owens, 881 F.2d 44, 52 (3d Cir. 1989). That is plainly not the case here.

Other crimes evidence is routinely admitted when it is relevant[15] to show "identity." See, e.g., Fed. R. Evid. 404(b); Pa. R. Evid. 404(b)(2). Here, Bronshtein's confession to the Philadelphia police that he killed Slobotkin was relevant to show the identity of Gutman's killer because Bronshtein later informed the Montgomery County police that Slobotkin's killer also murdered Gutman. Bronshtein's confession to the Slobotkin murder was not rendered irrelevant by his subsequent contradictory statement to the Montgomery County police that Karlitsky killed Slobotkin, as well as Gutman. Relevant evidence does not become irrelevant just because contradictory evidence exists. Conflicting evidence presents a question of credibility for the trier of fact, not a question of relevance for the court, and of course a trier of fact is under no obligation to accept or reject a party's admissions in toto. On the contrary, a trier of fact may believe some of the party's admissions and disbelieve others. Here, Bronshtein's statement that he killed Slobotkin and his statement to the Montgomery County police that Karlitsky was the killer were both relevant to show the identity of Gutman's murderer, and it was proper for the trial judge to admit both statements.

## VII.

Bronshtein's final argument concerns comments made by the prosecutor in his guilt phase summation. In short, the prosecutor argued that, although Bronshtein's attorney had suggested that Karlitsky was a major organized crime figure and that Karlitsky had killed Gutman, the defense had not offered any

---

[15]In this context, "relevant" means sufficient to support a finding that the other crime or wrong occurred and that the defendant was the actor. Huddleston v. United States, 485 U.S. 681, 689 (1988).

significant evidence to support this theory. According to the prosecutor, even the Leo Mall evidence was weak.[16]

---

[16]The prosecutor stated:

> And I suggest to you they would search high and low, heaven and hell, to try and get somebody in this courtroom, expert or otherwise, that can put Karlitsky somehow related to some scam –
>
> . . . .
>
> They would be more than happy to find somebody that would come in here and link [Karlitsky] to some scam, link him to some involvement of the mob.
>
> Ask their own so-called expert, the man they're putting forth as the expert, "Have you ever heard of Karlitsky?"
>
> . . . .
>
> Did you hear that question even posed to their expert? Did you hear he heard him [Karlitskly] involved in anything?
>
> What is this, what he has labeled, Nicky Scarfo-like head? What's his criminal background? No robberies, like he said. No murders, like he said. Big Nicky Scarfo, Daddy Warbucks Scarfo, headed this Russian Mafia, Russian Mob, has a shoplifting arrest from 1990. That's where they got his fingerprints from, a shoplifting arrest. No other criminal history, nothing with robberies, nothing with murders[.] . . . That's a smoke screen,

ladies and gentlemen, you can conclude based on the evidence that's been presented to you.

That's something where they're trying to take your focus off the ball, trying to get your attention deflected off of what you can conclude based on the law and the evidence is the real truth in this case.

They want you to believe a Karlitsky. They have to have you believe a Karlitsky if their defense is going to apply, if their defense is going to work.

But nobody has heard of him. Organized crime hasn't heard of him. He's not linked to any scams, not linked to any organized crime –

. . . .

Nothing. No links whatsoever that have been brought forward in this case no matter how many times he wants to object, but that's still the way it is. And that's still the facts in this case.

The only thing they even alluded to – and I suggest to you, they didn't even give you the whole picture – was they alluded to some Leo Mall store he had as a jeweler. He starts talking about this consignment stuff.

You haven't heard one word about any consignment from Leo Mall. You haven't heard word one about his

Bronshtein claims that the prosecutor's statements violated his due process rights. He contends that the comments on the defense's failure to present evidence in support of the defense theory were improper because the prosecutor knew that, but for the trial court's preclusion of Hart's testimony, the defense would have presented "evidence that Karlitsky had previously committed jewelry robberies and scams in support of the defense theory that Karlitsky . . . held the intent, motive and means for committing the instant offenses." Bronshtein's Br. at 104.

involvement in any scam from Philadelphia Police involved in the Leo Mall, not one iota about that; but they bring it forth and they argue it to you when they come here in closing to try and say, "Well, we'll infer he was involved in a scam here; so we'll take that and infer through our expert that Russian Jews are involved in scams and a lot of organized crime. From that, they do scams, and so we'll link him from maybe being in a scam, from being a Russian Jew to maybe working in scams they do. Wah-la. He's organized crime."

Think of the step that takes. Think of the leaps they take when they try and take that to you and whether it's founded in any of the evidence that has been presented to you. Think of that, because that's the linchpin of their defense; because if this fear is dispelled, if this Karlitsky does not exist in terms of doing anything in this case, then, their defense goes down the tubes.

App. V, Pt. 2 at 1585-88.

56

Improper remarks by a prosecutor may "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Due process is violated where the misconduct "constitutes a 'failure to observe that fundamental fairness essential to the very concept of justice.'" Id. at 642. No such violation occurred here.

In discussing the prosecutor's comments, the Pennsylvania Supreme Court accurately noted that the defense had not proffered any evidence that Karlitsky had staged the robbery of his own store, only evidence that the police suspected him of involvement. See Bronshtein, 691 A.2d at 920. Moreover, there was no evidence linking Karlitsky to "the Russian 'mafia.'" Id. The Pennsylvania Supreme Court observed:

> [A] review of the transcript of an *in camera* discussion reveals that, although appellant's expert had personally investigated the possibility of Karlitsky's involvement in an alleged scam at the Leo Mall jewelry store, there had been no evidence to link Karlitsky to any such scam or to link any jewelry scam to the Gutman murder . . . .
>
> Trial counsel dedicated more than half of his sixty page closing argument to the theory that Karlitsky had committed the murder as part of a jewelry store scam involving the Russian "mafia," and that appellant had confessed to the Slobotkin murder out of fear of Karlitsky. Given that there was no evidence, either at trial or in the defense proffer on the substance of the excluded testimony, of Karlitsky's involvement in an alleged scam at the store or his connection to the Russian "mafia," it was not improper for the prosecution to ask the jury to draw an inference that no such evidence existed.

Id.

We agree with the state supreme court's analysis of this issue and hold that the summation did not violate Bronshtein's

federal constitutional rights.

## VIII.

For the reasons set out above, we reverse the order of the District Court in part and affirm in part, and we remand for further proceedings consistent with this opinion.