**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-9003
_____

ANTYANE ROBINSON,
Appellant

v.

JEFFREY BEARD, Commissioner, Pennsylvania Department
of Corrections; LOUIS FOLINO, Superintendent of the State
Correctional Institution at Greene; FRANKLIN TENNIS,
Superintendent of State Correctional Institution at
Rockview; ATTORNEY GENERAL OF THE STATE OF
PENNSYLVANIA; JAIME KEATING
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 1:05-cv-1603)
District Judge:  Honorable Yvette Kane

Argued:  October 21, 2013
_____

Before:  CHAGARES, VANASKIE, and ALDISERT, Circuit
Judges.

(Filed: August 12, 2014)

Matthew C. Lawry, Esq. (Argued)
Timothy P. Kane, Esq.
Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 545 West
Philadelphia, PA 19106

Beth A. Muhlhauser, Esq.
Anne L. Saunders, Esq.
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
     Attorneys for Appellant Antyane Robinson

Jaime M. Keating, Esq. (Argued)
Cumberland County Office of District Attorney
1 Courthouse Square
2nd Floor, Suite 202
Carlisle, PA 17013
     Attorney for Appellees

————————————

OPINION

————————————

CHAGARES, <u>Circuit Judge</u>.

Antyane Robinson appeals the District Court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Robinson received a death sentence after a jury convicted him of first degree murder and related charges. For the reasons that follow, we will affirm the judgment of the District Court.

I.

On March 13, 1997, following a jury trial in the Cumberland County Court of Common Pleas, Robinson was convicted of first degree murder of Rashawn Bass, attempted criminal homicide of Tara Hodge, and related offenses. The evidence at trial established that, on June 29, 1996, Robinson made an unannounced visit to Hodge, his ex-girlfriend, at her apartment. When Robinson discovered that Hodge's new boyfriend, Bass, was taking a shower in the apartment, an argument ensued. Robinson told Hodge to make Bass leave the apartment, but Hodge refused and attempted to block Robinson from entering the bathroom. Robinson pulled a semiautomatic handgun out of his waistband and shot Hodge

2

in the head, rendering her unconscious. Robinson then proceeded into the bathroom and shot Bass seven times, killing him. Hodge survived and called the police after she regained consciousness.

At trial, the prosecutor emphasized that Robinson was from the "big city," and that he shot two people for "a perceived disrespect." See Appendix ("App.") 164. The prosecutor elicited testimony concerning Robinson's attempts to purchase firearms years before the offense as well as Robinson's possession of a gun, bulletproof vest, ammunition, and other military gear. The trial court also admitted evidence seized from Robinson's home, including photographs of Robinson posing with guns. See Commonwealth v. Robinson, 721 A.2d 344, 350 (Pa. 1998) ("Robinson I"). In his closing argument, the prosecutor described Robinson as follows:

> Now, there was an image projected here, and it's that big city image. . . . Man, I got to carry a gun wherever I go. [Robinson's] not the person in here that all my life I've been treated so badly. This is the image of a kind of person capable of forming specific intent to kill. This is a lifestyle. You look at that and you judge these acts carefully. . . . . [A] person that wants to project this kind of image, the kind of guy that has to drive into Cumberland County and have guns in his waistband and his home has to have a bullet proof vest, those are the kind of guys I submit to you that say I ain't going to be disrespected, disrespect me and you're going to have to pay.

App. 452-56.

During the penalty phase of Robinson's trial, the prosecutor elicited testimony indicating that Robinson: was on probation at the time of the murder for a prior assault and battery and carrying a deadly weapon, App. 530; violated various conditions of his probation, App. 515; and was convicted for assaulting another woman, App. 518-19. The prosecutor also described to the jury the purpose of aggravating circumstances: "there are some crimes and the manner in which you do them that are more terrible than other

3

ones, and we want to tell people, okay, do the first crime but for God sake then stop." App. 537. Explaining the applicability of aggravating circumstances to Robinson's case, the prosecutor stated: "[a]nd then while he is killing Rashawn [Bass] another person gets almost killed. That's a serious thing that we have to stop . . . ." App. 543. In addition, he described the applicability of the "grave risk" aggravating circumstance, 42 Pa. Cons. Stat. § 9711(d)(7), to the jury as follows:

> Here we're trying to say, gees, . . . if you're going to kill somebody, don't create a risk of killing someone else. Because in the course of this killing, and by your very verdicts you said, yeah, he killed Rashawn Bass and he had the specific intent to do that, and while he's doing that, in the course of that killing, he also created grave risk of death to Tara Hodge, and you heard that testimony. The doctor said had that angle changed just a bit, that girl would be dead. You all heard about what a vital organ the head is, and that's just a common sense thing. So if you're going to create a grave risk of death, that puts you in that seat that we're sitting in today.

App. 538.

Following closing arguments at the penalty phase, Robinson's counsel moved for a jury instruction, pursuant to Simmons v. South Carolina, that Robinson would be ineligible for parole should he receive a life sentence rather than the death penalty. See 512 U.S. 154 (1994) (holding that the jury must be informed that the defendant is ineligible for parole when the prosecution raises the defendant's future dangerousness and state law prohibits release on parole for capital defendants). Robinson's counsel argued that "the Commonwealth put . . . the issue of future dangerousness in when he said it was a lifestyle choice . . . [and] bringing into issue the other shootings makes future dangerousness an issue." App. 533. The prosecutor responded: "I think the jurors have a right to hear what his past has been. I do not intend to argue that he will be a future danger." Id. The trial court denied defense counsel's motion and did not give the jury a Simmons instruction.

4

Finally, the trial court gave the following jury charge, in pertinent part, regarding aggravating circumstances:

> In this case, the aggravating circumstances that are being submitted to you for your consideration to determine whether the Commonwealth has proven them beyond a reasonable doubt are . . . right out of the Pennsylvania statute. . . . One, in the commission of the criminal homicide defendant knowingly created a grave risk of death to Tara Hodge and in addition to Rashawn Bass who was the victim of the offense.

App. 560-61. Robinson's counsel did not object to this instruction.

The jury found unanimously that two aggravating circumstances applied to Robinson: (1) knowingly creating a grave risk of death to another person in addition to the victim in the commission of a murder, 42. Pa. Cons. Stat. § 9711(d)(7); and (2) committing a murder while in the perpetration of a felony, id. § 9711(d)(6). The jury also found two mitigating circumstances: (1) Robinson's youth, id. § 9711(e)(4); and (2) his future contributions to society, see id. § 9711(e)(8). After concluding that the aggravating circumstances outweighed the mitigating circumstances, see id. § 9711(c)(1)(iv), the jury returned a verdict of death. On April 1, 1997, the trial court formally imposed upon Robinson a death sentence for first degree murder and a consecutive term of imprisonment of six years and nine months to twenty years for aggravated assault.

The Pennsylvania Supreme Court affirmed Robinson's conviction and sentence. Robinson I, 721 A.2d 344. The United States Supreme Court denied Robinson's petition for a writ of certiorari. Robinson v. Pennsylvania, 528 U.S. 1082 (2000). On October 16, 2000, Robinson filed a counseled petition under Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541-9546. Following hearings held on October 10 and 18, November 29, and December 14, 2001, the state court denied Robinson's PCRA petition. The Pennsylvania Supreme Court affirmed the

5

denial of his PCRA petition. Commonwealth v. Robinson, 877 A.2d 433 (Pa. 2005) ("Robinson II").

On August 8, 2005, Robinson filed a counseled petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Middle District of Pennsylvania. On January 19, 2006, he filed an amended petition. Robinson asserted eighteen grounds for relief, including the two that he argues in this appeal: (1) the state trial court violated his due process rights when it declined to give a Simmons instruction; and (2) there was insufficient evidence to support the jury's finding of the "grave risk" aggravating circumstance, and the trial court improperly instructed the jury with regard to this aggravating circumstance.

On September 30, 2011, the District Court denied Robinson's petition. The District Court found that: (1) "when considered in context, the prosecutor's questioning and comments did not convey a message that Robinson posed a threat of future dangerousness if not sentenced to death," and therefore a Simmons instruction was not required, Robinson v. Beard, No. 1:05-CV-1603, 2011 WL 4592366, at *62 (M.D. Pa. Sept. 30, 2011); and (2) there was "ample evidence" to support the jury's finding that the "grave risk" aggravating circumstance applied, and the trial court did not improperly instruct the jury, id. at *58. The court granted a certificate of appealability on the issues of "whether the trial court's jury instruction on the "grave risk" aggravating circumstance ran afoul of the Eighth Amendment and whether there was sufficient evidence to support a finding that the "grave risk" aggravating circumstance was applicable to Robinson." Id. at *72.

Robinson filed a notice of appeal on October 28, 2011. Thereafter, he filed a motion in this Court to expand the certificate of appealability under 28 U.S.C. § 2253(c)(1) to include seven more issues. We granted a certificate of appealability on the additional issue of "whether the state supreme court's determination on direct appeal that the trial court did not err in declining to instruct the jury, pursuant to Simmons v. South Carolina, 512 U.S. 154 (1994), that appellant was ineligible for parole was contrary to or an

unreasonable application of Supreme Court precedent." App. 144. We noted that "[j]urists of reason could debate whether the prosecutor argued future dangerousness, thereby triggering the need for the <u>Simmons</u> instruction." <u>Id.</u> We also ordered the parties to brief whether the trial court's failure to give a <u>Simmons</u> instruction would constitute harmless error under <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). We denied Robinson's motion in all other respects.[1]

## II.

The District Court had jurisdiction over Robinson's habeas corpus petition pursuant to 28 U.S.C. § 2254, and we have appellate jurisdiction under 28 U.S.C. §§ 1291 and 2253. Because the District Court did not hold an evidentiary hearing and relied on the state court record, we exercise plenary review. See <u>Lambert v. Blackwell</u>, 387 F.3d 210, 231 (3d Cir. 2004).

Section 2254(d) of the Antiterrorism and Effective Death Penalty Act ("AEDPA") provides, in pertinent part, that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated

---

[1] On May 20, 2013, Robinson filed a brief in this Court raising issues not encompassed in the certificates of appealability. Robinson also asked us to expand the page and word limits for his brief and to expand the certificate of appealability. We denied Robinson's requests and ordered him to file a conforming brief, which he did on July 1, 2013. The appellees contend that this brief is also nonconforming, because it is 63 pages rather than 30, <u>see</u> Fed. R. App. P. 32(a)(7)(A), and it raises an issue (ineffective assistance of counsel relating to the "grave risk" aggravating factor) not encompassed in the certificates of appealability. <u>See</u> Appellees' Supplemental Br. 2.

The appellees are correct that we cannot consider Robinson's ineffective assistance of counsel claim because neither this Court nor the District Court granted a certificate of appealability on that issue. As for page length, Federal Rule of Appellate Procedure 32(a)(7)(A) provides: "[a] principal brief may not exceed 30 pages, or a reply brief 15 pages, unless it complies with Rule 32(a)(7)(B) and (C)." Rule 37(a)(7)(B)(i) provides that "[a] principal brief is acceptable if: it contains no more than 14,000 words." Robinson's counsel submitted a certificate of compliance, pursuant to Rule 37(a)(7)(C), stating that the corrected brief contains 12,042 words. Thus, Robinson's brief conforms to the rules of this Court.

on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . .

"This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt . . . ." Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011) (quotation marks and citation omitted). To determine whether a state court decision is contrary to clearly established law, "a federal court must consider whether the decision applies a rule that contradicts [such] law and how the decision confronts [the] set of facts that were before the state court." Id. at 1399 (quotation marks omitted). A state court decision is "contrary to [] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases," Williams v. Taylor, 529 U.S. 362, 405 (2000), or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent," id. at 406. "If the state court decision identifies the correct governing legal principle in existence at the time, a federal court must assess whether the decision unreasonably applies that principle to the facts of the prisoner's case." Cullen, 131 S. Ct. at 1399 (quotation marks omitted).

In order for § 2254(d)(1) to apply, the state court must have adjudicated a petitioner's claim "on the merits." A state court's decision is an adjudication on the merits where it is "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Simmons v. Beard, 590 F.3d 223, 232 (3d Cir. 2009) (quotation marks omitted). In such cases, the federal court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S. Ct. at 1398. If a petitioner's claims were not adjudicated on the merits, they do not fall under § 2254(d)(1), and the federal court must

8

apply the pre-AEDPA standard, "reviewing pure legal questions and mixed questions of law and fact de novo" and presuming that the state court's factual determinations are correct unless those factual determinations are rebutted by clear and convincing evidence. Beard, 590 F.3d at 231.

In the present case, the District Court applied the deferential AEDPA standard to Robinson's Simmons claim, but not to his claims regarding the "grave risk" aggravating circumstance. We review de novo the District Court's legal conclusion as to whether AEDPA deference applies. Id. In considering whether § 2254(d)(1) applies, we review the "last reasoned decision" of the state courts on the petitioner's claims. Id. at 231-32.

## III.

Robinson contends that the state impliedly argued his future dangerousness during the guilt and penalty phases of his trial. Thus, Robinson argues, the trial court should have instructed the jury that "life imprisonment" under Pennsylvania law means "life imprisonment without parole."

## A.

Robinson relies primarily on Simmons v. South Carolina to support his argument. In Simmons, the defendant was convicted of capital murder for killing an elderly woman. 512 U.S. at 156-57. The defendant had a history of assaulting elderly women, and both defense and state witnesses agreed that the defendant posed a continuing danger to elderly women. Id. at 157. During the penalty phase of the defendant's trial, the prosecutor stated that the question for the jury was "what to do with [the defendant] now that he is in our midst." Id. (quotation marks omitted). The prosecutor urged that a death sentence would be "a response of society to someone who is a threat. Your verdict will be an act of self-defense." Id. Defense counsel requested a jury instruction regarding parole ineligibility, and the trial court denied this request. Id. at 158-60. During deliberations, the jury asked if a life sentence included the possibility of parole. Id. at 160. The trial court instructed the jury not to consider parole or parole eligibility and told the jury that life imprisonment and

death should be understood in their plain and ordinary meaning.  Id.  The jury returned a death verdict.  Id.

A plurality of the Supreme Court ruled that, under these circumstances, due process required the trial judge to inform the jury that the defendant would not have been eligible for parole if sentenced to life imprisonment.  It held that, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible."  Id. at 156.  The plurality reasoned that "[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant never will be released on parole."  Id. at 171.

In her concurrence, Justice O'Connor phrased the dispositive question as whether "the prosecution argues that the defendant will pose a threat to society in the future."  Id. at 177 (O'Connor, J., concurring).  This narrower view is controlling.  See, e.g., Bronshtein v. Horn, 404 F.3d 700, 716 (3d Cir. 2005); Rompilla v. Horn, 355 F.3d 233, 265 (3d Cir.), rev'd on other grounds sub nom., Rompilla v. Beard, 542 U.S. 966 (2004); see also Richmond v. Polk, 375 F.3d 309, 331 (4th Cir. 2004) (noting that Justice O'Connor's concurrence in Simmons is controlling).

Eight years later, the Supreme Court considered whether a Simmons instruction should have been given in Kelly v. South Carolina, 534 U.S. 246 (2002).  In Kelly, the prosecutor told the jury in his opening statement:  "I hope you never in your lives again have to experience what you are experiencing right now.  Being some thirty feet away from such a person.  Murderer."  Id. at 248 (quotation marks omitted).  The prosecutor also presented evidence that, while in prison, Kelly crafted a knife, attempted to escape, and planned to hold a female guard as a hostage.  Id.  In addition, the state relied upon evidence of "Kelly's sadism at an early age, and his inclination to kill anyone who rubbed him the wrong way."  Id. (citation omitted).  During closing arguments, the prosecutor referred to Kelly as "the butcher of Batesburg," "Bloody Billy," and "Billy the Kid," and told the jury that Kelly "doesn't have any mental illness.  He's

intelligent . . . . He's quick-witted. Doesn't that make somebody a little more dangerous . . . . [D]oesn't that make him more unpredictable . . . . murderers will be murderers. And he is the cold-blooded one right over there." Id. at 249-50. The trial court did not give the jury a Simmons instruction. Id. at 250.

The Supreme Court held that the trial court should have provided a parole ineligibility instruction because the state "accentuated the clear implication of future dangerousness raised by the evidence." Id. at 255. The majority observed that "evidence of violent behavior in prison can raise a strong implication of 'generalized . . . future dangerousness,'" so that "[a] jury hearing evidence of a defendant's demonstrated propensity for violence reasonably will conclude that he presents a risk of violent behavior, whether locked up or free, and whether free as a fugitive or as a parolee." Id. at 253-54 (quoting Simmons, 512 U.S. at 571). The majority explained, moreover, that "[e]vidence of future dangerousness under Simmons is evidence with a tendency to prove dangerousness in the future; its relevance to that point does not disappear merely because it might support other inferences or be described in other terms." Id. at 254.

The Kelly dissenters, including two of the Justices who joined Justice O'Connor's concurring opinion in Simmons, argued that the Court had improperly extended the reach of Simmons. Justice Rehnquist, joined by Justice Kennedy, observed that "the test is no longer whether the State argues future dangerousness to society; the test is now whether evidence was introduced at trial that raises an 'implication' of future dangerousness to society." Id. at 261 (Rehnquist, C.J., dissenting). Justice Thomas, joined by Justice Scalia, dissented separately and asserted: "the Court dilutes the Simmons test, now requiring that a parole ineligibility instruction be given where the prosecution makes arguments that have a 'tendency to prove dangerousness in the future.'" Id. at 263 (Thomas, J., dissenting). We have noted accordingly that Kelly "arguably broadened the holding in Simmons." Rompilla, 355 F.3d at 266; see also Bronshtein, 404 F.3d at 716 (same).

B.

On direct appeal, the Pennsylvania Supreme Court rejected Robinson's argument that the trial court erred in declining to give a <u>Simmons</u> instruction.[2] The court held that, "where the only references to the dangerousness of appellant relate to appellant's past dangerousness a <u>Simmons</u> instruction is not necessary." <u>Robinson I</u>, 721 A.2d at 355. The court also reasoned that a <u>Simmons</u> instruction is necessary only when the future dangerousness of the defendant is "expressly implicated." <u>Id.</u> Since the Pennsylvania Supreme Court adjudicated Robinson's claims on the merits, we will review its determination under the deferential standard set forth in § 2254(d)(1).

1.

Robinson asserts, under § 2254(d)(1), that the Pennsylvania Supreme Court unreasonably applied <u>Simmons</u> when it held that future dangerousness is never placed at issue by references to a defendant's prior conduct and must be "expressly implicated" to trigger the need for a <u>Simmons</u> instruction.

Under § 2254(d)(1), our review is limited to deciding whether a state court decision is contrary to or an unreasonable application of Supreme Court precedent "as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000); <u>see also</u> <u>Greene v. Fisher</u>, 132 S. Ct. 38, 44 (2011) ("[Section] 2254(d)(1) requires federal courts to focus on what a state court knew and did . . . ." (quotation marks and alteration omitted)). Since the Supreme Court decided <u>Kelly</u> after Robinson's conviction became final, we must determine whether to apply <u>Kelly</u> in the instant matter.

Robinson argues that <u>Kelly</u> "did not create or apply any new rule of law, but simply applied the holding of

---

[2] Robinson also raised this argument in his PCRA petition. The Pennsylvania Supreme Court determined that the claim was previously litigated and declined to consider it on the merits. <u>Robinson II</u>, 877 A.2d at 439. Therefore, he exhausted this claim in the state courts, as required by AEDPA. <u>See</u> 28 U.S.C. § 2254(b)(1)(A).

Simmons to the specific facts before it." Robinson Br. 34. Therefore, he suggests, we may consider Kelly in determining whether the state court's application of Simmons was unreasonable. Our prior case law, however, forecloses this argument. As noted earlier, the Supreme Court decision in Kelly "arguably broadened the holding in Simmons." Rompilla, 355 F.3d at 266; see also Bronshtein, 404 F.3d at 716 (same). Accordingly, we have declined to apply Kelly where a state court decision preceded it, Rompilla, 355 F.3d at 267, and we will not apply Kelly here.[3]

2.

The fundamental takeaway from Simmons is that a jury cannot be presented with generalized arguments regarding the defendant's future dangerousness while also being prevented from learning that the defendant will never be released on parole. While we recognize that the evidence in many, if not all, capital cases will tend to show that a defendant may be dangerous in the future, Simmons does not require a parole ineligibility instruction in every case. The state court's view that a Simmons instruction is not necessary where the only references to a defendant's dangerousness relate to his past conduct draws a reasonable limiting principle that is consistent with the concerns set forth by the Supreme Court. Robinson I, 721 A.2d at 355.

Furthermore, the state court's conclusion that the defendant's future dangerousness must be "expressly implicated" to trigger the need for a parole ineligibility instruction comports with Justice O'Connor's formulation of the Simmons rule. 512 U.S. at 177 (O'Connor, J., concurring) (requiring the trial court to ask whether "the prosecution argues that the defendant will pose a threat to

---

[3] At oral argument, Robinson's counsel stated that resort to Kelly is unnecessary for Robinson's claim to succeed. In any event, even if we were to consider Kelly, that decision would not help Robinson. The prosecutor's statements were not comparable to those in Kelly, which clearly "invited [the jury] to infer 'that petitioner [was] a vicious predator who would pose a continuing threat to the community.'" Kelly, 534 U.S. at 256 (quoting Simmons, 512 U.S. at 176 (O'Connor, J., concurring)). Unlike the prosecutor in Kelly, who presented evidence that Kelly had engaged in violent behavior even while incarcerated, the prosecutor at Robinson's trial did not suggest to the jury that Robinson posed "a risk of violent behavior, whether locked up or free." Id. at 247.

society in the future"). A prosecutor may "expressly implicate" a defendant's future dangerousness – that is, he or she may argue it – without actually saying those particular words.

Unlike the prosecutor in Simmons, the prosecutor at Robinson's trial made no explicit mention of Robinson's ability to conform to society in the future. The prosecutor's statements characterizing Robinson as a "dangerous big city hoodlum," as well as the evidence regarding Robinson's ownership of guns and his criminal past, conveyed Robinson's specific intent to kill Bass and Hodge. See, e.g., App. 452 ("This is the image of a kind of person capable of forming specific intent to kill."). None of the prosecutor's statements implied that the jury should elect to sentence Robinson to death as an act of self-protection. Moreover, the prosecutor's comment regarding aggravating circumstances – "[t]hat's a serious thing that we have to stop" – conveyed the deterrent purposes of aggravating factors in a general sense. App. 543.

We agree with the District Court that the Pennsylvania Supreme Court's rejection of Robinson's Simmons claim cannot be disturbed under the narrow standard of review prescribed by AEDPA, and therefore we will affirm the District Court with respect to this claim.

IV.

Robinson's remaining two arguments relate to Pennsylvania's "grave risk" aggravating circumstance. The Pennsylvania capital sentencing statute sets forth eighteen aggravating factors, including the following: "[i]n the commission of the offense, the defendant knowingly created a grave risk of death to another person in addition to the victim of the offense." 42 Pa. Cons. Stat. § 9711(d)(7). The jury concluded unanimously that this aggravating circumstance applied to Robinson. Robinson argues that: (1) there was insufficient evidence to support the jury's finding that the "grave risk" aggravating circumstance applied; and (2) the trial court failed to limit its jury instruction properly, rendering the aggravating circumstance vague and overbroad.

A.

14

Before considering Robinson's substantive arguments, we must determine whether they are properly before this Court and, if so, which standard of review applies. It appears from Robinson's briefs that he expects us to review his claims de novo.

AEDPA requires a petitioner in state custody to exhaust all remedies available in the state courts before a federal court can grant his or her habeas petition. 28 U.S.C. § 2254(b)(1)(A). In Pennsylvania, a habeas corpus petitioner exhausts a claim by raising it either on direct appeal or in a petition under the PCRA. See Holloway v. Horn, 355 F.3d 707, 717 (3d Cir. 2004). In order to satisfy the exhaustion requirement, a petitioner must "fairly present[]" his or her federal claims to the state courts. Picard v. Connor, 404 U.S. 270, 275 (1971). That is, the "petitioner must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).

On direct appeal, Robinson did not raise any arguments pertaining to the "grave risk" aggravating circumstance. However, under 42 Pa. Cons. Stat. § 9711(h)(1), (3), the Pennsylvania Supreme Court must automatically review all death sentences and affirm a given death sentence "unless it determines that . . . the evidence fails to support the finding of at least one aggravating circumstance." In Robinson's case, the court reviewed his death sentence and determined that "the evidence was sufficient to establish the aggravating factors found by the jury." Robinson I, 721 A.2d at 355.

In his PCRA petition, Robinson expressly raised the arguments he now raises before this Court. The Pennsylvania Supreme Court determined, however, that Robinson had "offer[ed] nothing that was not already reviewed by this Court on direct appeal." Robinson II, 877 A.2d at 439. The court held that Robinson's arguments relating to the "grave risk" aggravating circumstance had been "previously litigated" on direct appeal and thus declined to address his claims. Id. at 438; see 42 Pa. Cons. Stat. § 9544(a)(2).

15

With regard to Robinson's sufficiency of the evidence claim, we must decide whether the Pennsylvania Supreme Court's automatic review on direct appeal satisfied AEDPA's exhaustion requirements. In Bronshtein v. Horn, we rejected the argument that a claim could automatically be exhausted on direct appeal by virtue of the Pennsylvania Supreme Court's mandatory appellate review in capital cases. See 404 F.3d at 726. But in that case, the state court had considered the petitioner's claims only under state law. See id. ("[O]ur review of the state court record reveals that the arguments that Bronshtein made with respect to these issues were based entirely on state, rather than federal, law. As a result, these claims were not properly exhausted." (footnote omitted)). In contrast, Robinson raises a straightforward sufficiency of the evidence claim, which is judged by the same standard under both Pennsylvania and federal law. See Jackson v. Virginia, 443 U.S. 307, 322 (1979); Evans v. Court of Common Pleas, 959 F.2d 1227, 1233 (3d Cir. 1992). Therefore, we will consider this claim to be exhausted and review it under the deferential standard set forth in AEDPA.[4]

Since no state court adjudicated Robinson's jury instruction claim, the deferential AEDPA standard is inapplicable. See Taylor v. Horn, 504 F.3d 416, 429 (3d Cir. 2007). We will thus review this claim de novo.

B.

---

[4] The District Court declined to apply AEDPA's exhaustion and procedural default requirements and reviewed this claim de novo, because the Commonwealth "deigned to provide the Court with only six sentences addressing [these claims]" and "neither addresse[d] these questions, nor provide[d] the Court with any citation to either the law or the record." Robinson, 2011 WL 4592366, at *57 n.42. Under AEDPA, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2). Thus, the District Court did not err in reviewing this claim.

Robinson argues that there was insufficient evidence for the jury to find that the "grave risk" aggravating circumstance applied to his case, in violation of his rights under the Eighth Amendment of the United States Constitution. He contends that, although shooting Hodge put her in danger, it did so before – not during – the commission of Bass's murder. He also suggests that the "grave risk" aggravating circumstance cannot apply in a situation where two victims are shot separately in different rooms.

The capital sentencing statute places upon the Commonwealth the burden of proving every element of an aggravating circumstance beyond a reasonable doubt. 42 Pa. Cons. Stat. § 9711(c)(1)(iii). In considering whether the evidence supports a finding that the "grave risk" aggravating circumstance is applicable, the court reviews "the actor's conduct to determine whether his conduct brought others into a life threatening situation." Commonwealth v. Thompson, 739 A.2d 1023, 1029 (Pa. 1999) (quotation marks omitted). There must be a nexus connecting the "'other persons' to the zone of danger created by the defendants actions in killing the victim." Commonwealth v. Paolello, 665 A.2d 439, 457 (Pa. 1995). "It is not necessary that the endangered bystander be directly in the line of fire for a grave risk of death to occur. The potential for an errant, ricochet or pass-through bullet can create the requisite risk." Commonwealth v. Rios, 684 A.2d 1025, 1036-37 (Pa. 1996) (quotation marks omitted).

Robinson relies heavily on the Pennsylvania Supreme Court's decision in Commonwealth v. Stokes, 615 A.2d 704 (Pa. 1992), to support his arguments. In Stokes, the evidence established that, while robbing a restaurant, Stokes locked four employees in a walk-in refrigerator and captured a fifth individual. Id. at 707-08. After determining that he had been identified, and resolving to kill the witnesses to his crime, Stokes opened the refrigerator door and fired shots into the refrigerator, killing two of the employees. Id. at 708. The fifth individual escaped from the kitchen and ran to the front door of the restaurant. Stokes cornered this individual at the locked front door and fired three more shots, killing him. Id. Stokes was charged with three counts of first degree murder. Id.

17

At the penalty phase of Stokes's trial, the trial judge instructed the jury that for each count of murder, the killing of the two other victims would satisfy the "grave risk" aggravating circumstance. Id. at 713. The jury found two aggravating circumstances, including the "grave risk" aggravating circumstance, and no mitigating circumstances as to each of the three indictments. Id. at 712. The trial court imposed upon Stokes three consecutive sentences of death. Id. On direct appeal, the Pennsylvania Supreme Court reversed the jury's finding, because the manner in which the trial court charged the jury with respect to the "grave risk" aggravating circumstance "precluded the jury from properly analyzing the applicability of that circumstance to the facts of this case." Id. at 714. The court noted that the "grave risk" aggravating circumstance could have applied only to the murders committed in the refrigerator, while it was "completely inapplicable" to the murder committed at the front door of the restaurant. Id.

Robinson suggests that, under Stokes, the factfinder must conduct a formalistic spatial inquiry to determine whether the "grave risk" aggravating circumstance applies. But Stokes does not stand for that proposition. The Pennsylvania Supreme Court deemed the "grave risk" aggravating circumstance inapplicable to the murder committed at the front door not only because it occurred a significant distance away from where the other individuals were located, but also because the defendant closed the refrigerator door before moving to the front of the restaurant, minimizing the possibility of a ricochet bullet. Id. The court also made clear that the jury must conduct a fact-specific inquiry to determine whether the "grave risk" aggravating circumstance applies. Id.

Furthermore, Robinson's reading of Stokes does not comport with the principles set forth in other Pennsylvania cases. Indeed, rather than focus merely on the physical proximity between the "other person" and the murder victim, Pennsylvania courts have looked more generally at whether there is a link between the risk of danger to the "other person" and the murder of the victim. See Paolello, 665 A.2d at 457 (requiring a "nexus . . . connecting the 'other persons' to the zone of danger created by the [petitioner's] actions in killing

the victim"); see also Commonwealth v. Counterman, 719 A.2d 284, 305 (Pa. 1998) (holding that by setting fire to his house and preventing his three children from escaping, the defendant created grave risk of death to his wife, firefighters, and neighbors, none of whom were trapped in the house); Commonwealth v. Wharton, 607 A.2d 710, 723-24 (Pa. 1992) (concluding that defendants created grave risk of death to infant, after having killed infant's parents, by abandoning infant in house with heat turned off in February); Commonwealth v. Mitchell, 599 A.2d 624, 628 (Pa. 1991) (holding that individuals sleeping upstairs were put at grave risk of death even though murder occurred downstairs).

Under this interpretation, reasonable jurors could have found that Robinson assaulted Hodge in the process of getting to Bass because Hodge attempted to block him. In addition, as Hodge lay unconscious in the adjoining bedroom just a few feet away, Robinson fired seven bullets at Bass, at least one of which passed through the bathroom wall and into the kitchen. Although no bullets passed into the bedroom, Hodge certainly could have been struck by a ricochet or pass-through bullet. The fact that she did not actually get shot again does not lessen the risk that she faced at the time.

Accordingly, we will affirm the District Court's holding that the Pennsylvania Supreme Court was reasonable in deciding that there was sufficient evidence to support the jury's finding of the "grave risk" aggravating circumstance.

## C.

Robinson asserts, finally, that the "grave risk" aggravating circumstance is unconstitutionally overbroad and vague, and that the trial court erred when it did not provide guidance to the jury on how to apply this aggravating circumstance beyond the words of the statute.[5] He relies on Gregg v. Georgia, 428 U.S. 153, 202 (1976), a case in which the Supreme Court noted that a similar Georgia statute "might be susceptible of an overly broad interpretation," and argues that the instruction given at his trial suffered from the vagueness problem identified in Gregg. See Robinson Br. 49.

---

[5] We note that Robinson's brief devotes only one paragraph to this argument.

Claims of vagueness directed at aggravating circumstances are analyzed under the Eighth Amendment. An aggravating circumstance is constitutional if it both: (1) applies "only to a subclass of defendants convicted of murder"; and (2) is not unconstitutionally vague. Tuilaepa v. California, 512 U.S. 967, 972 (1994). In defining "unconstitutionally vague," we impose a "quite deferential" standard of review, looking to whether the factor "has some common-sense core of meaning . . . that criminal juries should be capable of understanding." Id. at 973 (quotation marks omitted). Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand. Such statutes are "judged on an as-applied basis." Maynard v. Cartwright, 486 U.S. 356, 361 (1988). We focus on "whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way that violates the Constitution." Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quotation marks omitted).

Pennsylvania's "grave risk" aggravating circumstance is not overbroad on its face. The Supreme Court has routinely rejected vagueness challenges to aggravating circumstances, including the standard "grave risk" aggravating circumstance. See, e.g., Proffitt v. Florida, 428 U.S. 242, 256.[6] The language of the Pennsylvania statute is not difficult to understand or lacking in a "common-sense core of meaning." Criminal juries should be able to comprehend and apply this language straightforwardly.

Moreover, the "grave risk" aggravating circumstance was not applied unconstitutionally in Robinson's case. The trial court told the jury that the "grave risk" aggravating circumstance applied if "in the commission of the criminal homicide defendant knowingly created a grave risk of death to Tara Hodge and in addition to Rashawn Bass who was the victim of the offense." App. 560-61. This language mirrors the statute almost exactly, and like the statute itself, gave the jury sufficient guidance as to how to apply the law. All of the words in the Pennsylvania statute have plain meanings that

---

[6] Indeed, even though the Court in Gregg pointed out the potential vagueness issue with a similar "grave risk" aggravating factor, it ultimately upheld the statute as constitutional. See Gregg, 428 U.S. at 207.

would be understandable to the average juror. Thus, Robinson cannot show – and indeed, he has provided no arguments to support – that there is a "reasonable likelihood" that the jury applied the instruction in an unconstitutional manner.

We agree with the District Court that the trial court did not err when it provided instructions to the jury on the "grave risk" aggravating circumstance. We will affirm the District Court's holding with respect to this claim.

V.

For the reasons stated above, we will affirm the judgment of the District Court.